**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREENVILLE VENTURES LLC, | |
| Plaintiff, | CIVIL ACTION NO. 2:22-cv-03214 |
| v. | |
| JAMES JANNUZZIO, ET AL., | |
| Defendants/Counterclaimants. | |
| ──────────────────────── | |
| JAMES JANNUZZIO AND TREVOR NIX, | |
| Third-Party Plaintiffs, | |
| v. | |
| GREENVILLE VENTURES, LLC, | |
| Nominal Counter Defendant, | |
| and | |
| PETER C. DANBY, ET AL. | |
| Third-Party Defendants. | |
| ──────────────────────── | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF GREENVILLE VENTURES, LLC'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

> *"I have the keys to the crib and I don't have to give them up
> because I'm still an owner. You want the keys? Buy me."*
>
> - James Jannuzzio, July 19, 2021 text message, Ex. 75

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   CASE BACKGROUND ................................................................... 4

   A.    Relationship Between the Parties ............................................ 4

   B.    Greenville's Early Success ...................................................... 5

   C.    Defendants' Plans to Compete ................................................ 7

   D.    Defendants' Resignations ....................................................... 8

   E.    Defendants' Post-Resignation Control Over and Access to Greenville Data ................. 9

III.   ARGUMENT .............................................................................. 13

   A.    Defendants are Not Entitled to Summary Judgment on Greenville's Trade Secrets Claims. ........................................... 13

      1.   The Record Establishes Greenville's Ownership of the Trade Secret Databases. ..... 13

      2.   Greenville Took Reasonable Measures to Maintain the Secrecy of Its Trade Secret Databases. .............................. 17

      3.   There is Significant Record Evidence that Defendants Misappropriated Greenville's Trade Secret Information .......................... 22

   B.    Defendants are Not Entitled to Summary Judgment on Greenville's Unfair Competition Claim. ............................................ 23

      1.   Pennsylvania Law Recognizes a Claim for Unfair Competition. ............................... 23

      2.   The Pennsylvania Uniform Trade Secrets Act ("PUTSA") Does Not Preempt Greenville's Unfair Competition Claim. ......................... 24

      3.   Ample Record Evidence of Defendants' Malicious Acts Against Greenville Undermines Defendants' Claim that Their Conduct Was "Permissible." ................. 25

   C.    Defendants are Not Entitled to Summary Judgment on Greenville's Conversion Claim Because There is Significant Evidence that the Individual Defendants Procured Greenville's Information by Improper Means ...................... 31

   D.    Defendants are Not Entitled to Summary Judgment on Greenville's Civil Conspiracy Claim. ...................................... 32

   E.    Defendants are Not Entitled to Summary Judgment on Greenville's Tortious Interference Claim Given the Significant Evidence of Jannuzzio's Intent to Harm Greenville and Unauthorized Conduct. ................................ 34

   F.    Defendants are Not Entitled to Summary Judgment on Greenville's Breach of Fiduciary Duty Claim. ..................................... 36

1.   There is a Genuine Issue of Material Fact as to Whether Malizia Owed Greenville a Duty of Loyalty...........................................................................36

2.   There is a Genuine Issue of Material Fact as to Whether Jannuzzio and Nix Owed Greenville a Duty of Loyalty..........................................................37

3.   The Individual Defendants' Competitive Conduct While Still at Greenville Went Beyond Preparatory Measures..................................................38

G.   Defendants are Not Entitled to Summary Judgment on Greenville's Unjust Enrichment Claim...................................................................................40

H.   Defendants are Not Entitled to Summary Judgment on Greenville's SCA and CFAA Claims...................................................................................42

1.   Record Evidence of Unauthorized Access to Greenville Electronic Data Precludes Entry of Summary Judgment.................................................42

2.   The Material in Question Was Not Housed on a Personal Computing Device .......43

3.   Greenville Has Put Forth Evidence of Its CFAA Damages.................................45

I.   Summary Judgment is Not Warranted on Greenville's Judicial Dissociation Claim Given Significant Evidence of Improper Conduct by Defendants.............................45

IV.   Conclusion...........................................................................................48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alpha Pro Tech, Inc. v. VWR Int'l LLC*,
   984 F. Supp. 2d 425 (E.D. Pa. 2013) .................................................................. 18, 21, 40

*Am. Int'l Airways, Inc. v. Am. Int'l Group, Inc.*,
   Civ.A. No. 90–7135, 1991 WL 255661 (E.D. Pa. Nov.14, 1991) ...................................... 29

*Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*,
   321 F. Supp. 3d 503 (M.D. Pa. 2018), *aff'd*, 816 F. App'x 644 (3d Cir. 2020) .................... 36

*Brentwood Indus., Inc. v. Entex Techs., Inc.*,
   No. CIV.A. 04-CV-03892, 2005 WL 757189 (E.D. Pa. Mar. 31, 2005) ............................. 18

*Bro-Tech Corp. v. Thermax, Inc.*,
   651 F. Supp. 2d 378 (E.D. Pa. 2009) .................................................................. 25, 40, 43

*Brooks v. AM Resorts, LLC*,
   954 F. Supp. 2d 331 (E.D. Pa. 2013) .................................................................. 44

*Brown & Brown v. Cola*,
   745 F. Supp. 2d 588 (E.D. Pa. 2010) .................................................................. 38

*Castle Cheese, Inc. v. MS Produce, Inc.*,
   No. CIV.A 04-878, 2008 WL 4372856 (W.D. Pa. Sept. 19, 2008) ................................... 37

*Cent. Lending Grp., LLC v. Seckel Cap., LLC*,
   No. 822 EDA 2016, 2017 WL 4861625 (Pa. Super. Ct. Oct. 26, 2017) ............................. 23

*Checker Cab Philadelphia, Inc. v. Uber Techs., Inc.*,
   689 F. App'x 707 (3d Cir. 2017) ........................................................................ 23

*Christian v. Lannett Co., Inc., No. CV 16-963*,
   2018 WL 1532849 (E.D. Pa. Mar. 29, 2018) ......................................................... 21

*Commw. v. Minds Coal Mining Corp.*,
   60 A.2d 14 (Pa. 1948) ..................................................................................... 37

*E. Frank Hopkins Seafood, Co. v. Olizi*,
   No. 2:17-CV-01558, 2017 WL 2619000 (E.D. Pa. June 16, 2017) ................................... 25

*EXL Labs., LLC v. Egolf*,
   No. 10–6282, 2010 WL 5000835 (E.D. Pa. Dec. 7, 2010) ............................................ 21

*Fenton v. Balick*,
    821 F. Supp. 2d 755 (E.D. Pa. 2011).................................................................. 32

*Garcia v. City of Laredo*,
    702 F.3d 788 (5th Cir. 2012)........................................................................... 44

*Graham Eng'g Corp. v. Adair*,
    No. 1:16-CV-2521, 2021 WL 9204331 (M.D. Pa. Feb. 10, 2021) ..................... 44

*Hardy v. Trustees of Univ. of Penn.*,
    No. 381 EDA 2014, 2014 WL 10556361 (Pa. Super. Ct. Dec. 26, 2014)........... 24

*Houser v. Feldman*,
    569 F. Supp. 3d 216 (E.D. Pa. 2021).............................................................. 18

*In re CTLI, LLC*,
    528 B.R. 359 (Bank. S.D. Tex. 2015) ............................................................. 16

*In re Google Inc.*,
    806 F.3d 125 (3d Cir. 2015)........................................................................... 44

*In re Larkin*,
    No. ADV 12-1809 KCF, 2015 WL 1472115 (D.N.J. Mar. 31, 2015)................. 29

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d 262 (3d Cir. 2016).......................................................................43, 44

*Int'l Bhd. of Teamsters Loc. 651 v. Philbeck*,
    464 F. Supp. 3d 863 (E.D. Ky. 2020).............................................................. 16

*Jannuzzio, et al., v. Danby, et al.*,
    22-cv-1189 (E.D. Pa)..................................................................................... 46

*Jazz Pharms., Inc. v. Synchrony Grp., LLC*,
    343 F. Supp. 3d 434 (E.D. Pa. 2018).............................................................. 13

*Lux Glob. Label Co., LLC v. Shacklett*,
    No. CV 18-5061, 2019 WL 3530424 (E.D. Pa. July 31, 2019)........................ 21

*Mallet & Co. Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021).......................................................................14, 20

*N. Am. Commc'ns, Inc. v. Sessa*,
    No. CIV.A. 3:14-227, 2015 WL 5714514 (W.D. Pa. Sept. 29, 2015) ............... 37

*Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*,
    13 F. Supp. 3d 465 (E.D. Pa. 2014)............................................................... 13

*Penn St. Univ. v. Univ. Ortho. Ltd.*,
706 A.2d 863 (Pa. Super. Ct. 1998) ................................................. 23

*PNC Mortg. v. Superior Mortg. Corp.*,
No. 09–5084, 2012 WL 628000 (E.D. Pa. Feb. 27, 2012) ................................................. 25

*PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd.*,
47 F.4th 156 (3d Cir. 2022) ................................................. 41

*REVZIP, LLC v. McDonnell*,
No. 3:19-CV-191, 2023 WL 3260662 (W.D. Pa. May 4, 2023) ................................................. 13

*Rogers v. Gentex Corp.*,
No. 3:16-CV-00137, 2018 WL 1370611 (M.D. Pa. Mar. 16, 2018) ................................................. 32

*Schirnhofer v. Premier Comp Sols., LLC*,
832 F. App'x 121 (3d Cir. 2020) ................................................. 31

*Scranton Prod., Inc. v. Bobrick Washroom Equip., Inc.*,
190 F. Supp. 3d 419 (M.D. Pa. 2016) ................................................. 14, 20

*Stevenson v. Econ. Bank of Ambridge*,
197 A.2d 721 (Pa. 1964) ................................................. 32

*Swift Bros. v. Swift & Sons, Inc.*,
921 F. Supp. 267 (E.D. Pa.1995) ................................................. 21

*Synthes, Inc. v. Emerge Med., Inc.*,
25 F. Supp. 3d 617 (E.D. Pa. 2014) ................................................. 37, 38

*Teva Pharm. USA, Inc. v. Sandhu*,
291 F. Supp. 3d 659 (E.D. Pa. 2018) ................................................. 23

*Tincher v. Omega Flex, Inc.*,
104 A.3d 328 (Pa. 2014) ................................................. 23

*United States v. Eddings*,
No. 5:19-CR-00535, 2022 WL 12435082 (E.D. Pa. Oct. 20, 2022) ................................................. 43

*United States v. Traitz*,
871 F.2d 368 (3d Cir. 1989) ................................................. 30

*Walsh v. E. Penn Mfg. Co.*,
555 F. Supp. 3d 89 (E.D. Pa. 2021), *adhered to on denial of recon.*, No. CV
18-1194, 2021 WL 4215503 (E.D. Pa. Sept. 16, 2021) ................................................. 29

*Warman v. Loc. Yokels Fudge, LLC*,
No. CV 19-1224, 2022 WL 17960722 (W.D. Pa. Dec. 27, 2022) ................................................. 19

*Wen v. Willis,*
 No. CV 15-1328, 2015 WL 6379536 (E.D. Pa. Oct. 22, 2015)............................................ 38

**Statutes**

12 Pa. C.S. § 5302 ..............................................................................................*passim*

15 Pa. C.S. § 8850 ..............................................................................26, 27, 28, 42

15 Pa. C.S. § 8861 ..............................................................................................26, 46

18 U.S.C. § 1030 ..............................................................................................*passim*

18 U.S.C. § 1839(3)..............................................................................................*passim*

18 U.S.C. §§ 2701 et al..............................................................................................*passim*

## I.      INTRODUCTION

Defendants James Jannuzzio ("Jannuzzio"), Trevor Nix ("Nix"), Dominic Malizia ("Malizia"), and the Tondo Group, LLC's ("Tondo"), (collectively "Defendants," Jannuzzio, Nix and Malizia collectively, the "Individual Defendants") Motion for "Partial" Summary Judgment is a massive overreach, in which Defendants seek dismissal of Greenville's entire case, but spend the majority of their briefing to advance their view of the merits, completely untethered to the actual record or the relevant standard for summary judgment. Rather than focusing solely on undisputed issues of fact, Defendants instead spin a fictional narrative that is either wholly unsupported by the record evidence or worse, hotly disputed by facts Defendants know full-well yet intentionally ignore.[1]  Either way, there are no claims for which Defendants are entitled to summary judgment.

Defendants' kitchen-sink motion for summary judgment must be denied for at least the following reasons:

First, Defendants are not entitled to summary judgment on Greenville's trade secrets claims (Counts I and II). Defendants purposely fail to properly identify Greenville's trade secrets so they can argue that what *they* describe as the alleged trade secrets were insufficiently protected, ignoring what Greenville actually contends *are* its trade secrets – restricted-access databases maintained on Greenville's password-protected Google Workspace, available only to select Greenville personnel. Because there are factual disputes regarding: who owns the trade secrets; whether "reasonable" steps were taken to protect them (a quintessential jury question); and whether Defendants misappropriated the trade secrets by accessing them and refusing to return administrative control over them back to Greenville after their resignations, Defendants' motion for summary judgment

---

[1] This is perhaps most evident from the 33-pages Defendants filed as their "Concise" Statement of Facts, ECF No. 98-2, which is anything but "concise" and contains literally *dozens of pages* of alleged "facts" that are all contested (*see* Greenville's Response to Defendants' Concise Statement of Additional Facts, filed contemporaneously herewith), showing why Defendants cannot possibly be entitled to summary judgment.

1

on Counts I and II must be denied.

Second, Defendants are not entitled to summary judgment on Greenville's unfair competition claim (Count III) because: (1) contrary to Defendants' misleading representation of caselaw, Pennsylvania appellate courts *have* recognized the tort of unfair competition; (2) Greenville's unfair competition claim is not preempted by the Pennsylvania Uniform Trade Secrets Act ("PUTSA") because this claim is broader than its trade secret claims; and (3) the parties factually dispute virtually all of the underlying facts relating to Defendants' alleged misappropriation of any confidential information, including whether any of that information should be considered confidential at all.

Third, Defendants are not entitled to summary judgment on Greenville's conversion claim (Count IV) because the parties factually dispute whether Defendants procured any of Greenville's information by improper means and whether that information was accessed and/or used by Defendants for the benefit of Tondo.

Fourth, Defendants are not entitled to summary judgment on Greenville's civil conspiracy claim (Count V) because there is abundant evidence, including their own communications to one another, that the Defendants conspired to steal information from Greenville to start what they referred to as "Greenville 2" at Tondo, all of which the Defendants now factually dispute.

Fifth, Defendants are not entitled to summary judgment on Greenville's tortious interference claim (Count VI) because record evidence reflects that Jannuzzio purposefully obstructed and interfered with Greenville's relationships with, among others, Facebook, Google, Shopify, GoDaddy and its credit card providers, and Defendants not only deny that they interfered with any of these relationships, but also dispute whether their actions were justified.

Sixth, Defendants are not entitled to summary judgment on Greenville's breach of fiduciary duty claim (Count VII) because the parties dispute facts relating to: (1) whether Malizia should even be considered an employee of Greenville subject to any such duty; and (2) whether Defendants copied and/or otherwise seized control of Greenville's most sensitive data and information while still employed by Greenville (which Defendants dispute even occurred) for them to directly use against Greenville after they established their own "Greenville 2" at Tondo.

Seventh, Defendants are not entitled to summary judgment on Greenville's unjust enrichment claim (Count VIII) simply because an Operating Agreement exists. The unjust enrichment arises out of Defendants' alleged misappropriation of Greenville's confidential and proprietary information (which, of course, is itself factually disputed), having nothing to do with the parties' obligations under the Operating Agreement. And because the unjust enrichment comes from Defendants' misappropriation of Greenville's confidential and proprietary information, which covers much more than just its trade secrets, this claim is not preempted by Greenville's trade secret claims.

Eighth, Defendants are not entitled to summary judgment on Greenville's Stored Communications Act ("SCA") and Computer Fraud and Abuse Act ("CFAA") claims (Counts IX, X and XI) because, *at a minimum,* there are factual disputes regarding whether Defendants accessed Greenville's online accounts and systems "without authorization" given the multiple letters sent by Greenville and its lawyers revoking any permission to access this information, all of which were ignored. Moreover, Greenville does not allege that Defendants accessed information housed on a "personal computing device" outside the scope of the SCA and, contrary to Defendants' assertion, Greenville *has* put forth evidence of its CFAA damages.

Ninth, Defendants are not entitled to summary judgment on Greenville's dissociation claim (Count XII) because substantial record evidence, *in addition to this Court's own findings*, demonstrate Defendants' malintent with respect to Greenville which is more than sufficient for the factfinder to determine that Jannuzzio and Nix should be dissociated from Greenville, even if they weren't already dissociated pursuant to the Operating Agreement at the moment they resigned.

For all of the foregoing reasons, Defendants' sprawling motion for summary judgment, which is based on either non-extant facts or facts clearly in dispute, should be denied *in toto*.

## II.    CASE BACKGROUND

### A.    Relationship Between the Parties

At the center of this case is Peter Danby ("Danby"), a seasoned entrepreneur and longtime University of Delaware Professor who, for years before even meeting the Individual Defendants, successfully owned and operated multiple businesses relating to e-commerce, including those focused on warehousing/fulfilment, packaging, shipping/transportation and Information Technology (IT). It is undisputed (indeed Defendants boast) that Danby became a trusted mentor and advisor to Jannuzzio, who took several of Danby's classes, sought his personal advice on business matters, and even went to work at Danby's warehousing/fulfilment company, Iron Gate Hardware d/b/a IronLinx ("IronLinx"). *See* **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 219:17-220:19, 221:18-223:5, 232:15-17. As that business grew, Danby, also hired Jannuzzio's good friend, Nix, also a student at the University of Delaware.  *See id.* at 270:5-7; 211:23-212:6.

Danby continued to closely mentor Jannuzzio and Nix at IronLinx and when he was ready to create a new e-commerce company, Danby invited them each to take a minority ownership stake in the new venture that he would fund, which became Greenville Ventures, LLC ("Greenville"). Id. at 348:4-14; *see also* ECF No. 1, Exhibit A, Operating Agreement. Greenville is an e-commerce jewelry company that uses Facebook, Instagram and other social media platforms to advertise its

4

themed jewelry brands for sale online. **Ex. 31**, McCrory Expert Report at 4-5. As minority members with a 25% and 5% interest, respectfully, Jannuzzio and Nix agreed that Danby would be the Manager of Greenville, and he would have complete control over the company, including all day-to-day operations, decisions and management, which Jannuzzio and Nix expressly acknowledged when they signed the company's Operating Agreement. ECF No. 1, Exhibit A, Operating Agreement § 6.01 & Exhibit "A". Given Danby's significant experience and expertise, his willingness to fund Greenville and the resources available to him, it is unsurprising that Jannuzzio and Nix agreed that Danby would hold full authority to run the show. The Individual Defendants, including Malizia, Nix's then-roommate, all worked for Greenville, and were excited and grateful just to be a part of this new venture. *See* **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 212:6.

### B.    Greenville's Early Success

Greenville started several e-commerce stores selling themed costume jewelry, including in the following niches: nature (Brandywine); medical and military (MySuperhero); beach (Beachware); teaching (TeachersMerch); and pets (Pet&Love). ECF No. Compl. ¶ 41; ECF No. 19, Defendants' Answer ¶ 41 (admitting e-store themes). These stores were operated through online storefronts built via Shopify and utilized marketing strategies primarily based on paid social media advertising through Facebook, Instagram, Pinterest and Google. ECF No. 1, Compl. ¶ 34; ECF No. 19, Answer ¶ 34.

The key to Greenville's business is its ability to collect customer and product related data to optimize its advertising. This data includes: lists of targets and customers and their contact information; demographic data including age, geography, occupation and income; behavioral data including websites that targets and customers visited, products they viewed and purchased, order and payment histories, etc. **Ex. 31**, McCrory Opening Report at 5. By tracking and digesting all

this critical market data, Greenville could alter its advertising strategies, in real-time, to decide which products to market to which potential customers, when and how. *Id.*

Greenville was a runaway success, generating more than $10 million in revenue in its first full year of operations. *See* **Exs. 104-107**. Greenville's "secret sauce" was the compilation of all the data and metrics it collected from all the e-commerce and social media platforms it used into one central set of databases, so that all customer and market data collected could be collated, reviewed, manipulated and interpreted to optimize marketing efforts and maximize sales. These databases compiled detailed information about consumer behavior in response to Greenville's many ad campaigns, and granular data regarding each order and every customer, also tracking product costs, margins, etc., all linked together and programmed to automatically update in real-time. **Ex. 31**, McCrory Opening Report at 5. Greenville spent millions of dollars on advertising efforts to collect this data over many years. *See id.*

While on its own, Greenville's proprietary data from each of its various platforms was useful, it was the compilation of all of this information into one centralized, comprehensive set of databases that were all linked into one place and programmed to update in real-time, that provided Greenville with a real competitive advantage. **Ex. 21**, T. Nix. 4.4.23 Dep. 115:7-117:19 ("we can make real time decisions to move products around"… "it allows us to make fast, real[-]time decisions on product positions"… "It's valuable for the company"… "It really helps is for us to internally to make smart decisions"). Like a stockbroker who strategically pivots as the stock-ticker constantly updates, Greenville would modify its ad-spend throughout each day (sometimes spending tens of thousands of dollars a day) based on what its auto-updating data showed, deciding which products to support and which to abandon, and how best to target each of its intended customers with particular advertising and marketing strategies. *See id.*

6

The Individual Defendants worked hard with Danby to build and grow Greenville. And they were rewarded handsomely for doing so. In less than two years at Greenville (2019 to mid-2021), Jannuzzio and Nix were paid approximately $400,000 and $200,000 respectively, in salary, bonuses and distributions from Greenville. *See* **Ex. 13** at 10-11 & 17-23.

### C.    Defendants' Plans to Compete

Unfortunately, being part owners of a successful startup earning hundreds of thousands of dollars was not enough for these young men. Believing they no longer needed their longtime trusted mentor and that Jannuzzio – the self-proclaimed "MVP" of Greenville – could run the business better (and take more of the profits), the Individual Defendants devised a scheme to create their own copycat version of Greenville (referred to as "Greenville 2"), selling the same products to the same customers through the same platforms using as much as they could from Greenville, but without having to answer to (or share any profits with) Danby. *See* **Ex. 130** at 000093; **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 200:20-21.

Before his resignation, Mr. Jannuzzio made his intentions clear, stating that he was going to "royally fuck" Danby and that "sometimes I really feel bad about what I'm gonna do." **Ex. 66** at 000158. He put this plan in motion months prior to his resignation.

- On March 25, 2021, Jannuzzio purchased domains for one of Tondo's future stores – Frontline Boutique, which sold medical-themed jewelry. **Ex. 80** at 000002-5.

- On March 29, 2021, Jannuzzio exported a full listing of all of MySuperhero's products, which included MySuperhero's medical-themed products. **Ex. 125**.

- By April 1, 2021, Jannuzzio had engaged counsel and was executing on his plan. *See* **Ex. 72** (April 1, 2021 text exchange in which Mr. Jannuzzio indicates that he intended to send Danby correspondence through lawyers); **Ex. 65** (text of the same date with Jannuzzio's mother indicating his "plan is in motion.").

- Less than a month later, Jannuzzio directed a member of the Greenville team to make him the "owner" of Greenville's trade secret databases, entitled "Greenville Documents," giving him unfettered access to this valuable data, stored in Greenville's Google Workspace. **Ex. 113**.

- By late April 2021, Jannuzzio and Nix were choosing the name for Tondo. **Ex. 73**.

- On May 3, 2021, Jannuzzio texted a friend that he intended to take certain Greenville Facebook assets so he could "scale faster" at Tondo. **Ex. 74**.

- On May 6, 2021, Jannuzzio directed Nix to export "all store data" for Greenville's Beachware and Brandywine stores. **Ex. 119**.

- Just a day later, Jannuzzio sent a spreadsheet of Greenville products to a sourcing agent to copy. **Ex. 64**.

- On May 17, 2021, Jannuzzio formed Tondo via Jannuzzio Enterprises, LLC (an entity Jannuzzio solely owns), to compete with Greenville in the same costume jewelry niches – beach, nature, medical and military. **Ex. 90**.

- On May 20, 2021, Jannuzzio set up two-factor authentication on a Greenville platform to ping his phone, thereby controlling all access to that platform, despite imminent plans to leave Greenville. **Ex. 123**.

- On May 23, 2021, the day before he resigned, Jannuzzio took a lengthy video of all of Greenville's inventory listed in its InfoPlus warehouse management account. **Ex. 53**.

### D.  Defendants' Resignations

After months of secretly laying the groundwork for Tondo, Jannuzzio abruptly resigned from Greenville on May 24, 2021. **Ex. 126**. The very next day, Jannuzzio tried to extort Danby, demanding a buyout of his interest in Greenville for $1,000,000 in cash to be paid within 3 days, while he continued to hold administrative control over Greenville's most sensitive and proprietary data and digital assets. **Ex. 87**. In response, on May 26, 2021, Danby instructed Jannuzzio to return all operational accounts and responsibilities back to Greenville and directed that all financial decisions for the company would be made by Danby as Manager going forward. **Ex. 85**. Just a few hours later, Jannuzzio nonetheless cancelled all of Greenville's credit cards, which were linked to Greenville's various online accounts, including its Facebook and Google ad accounts, risking Greenville's accounts being tagged for non-payment and potential damage to advertising results. **Ex. 86**. Faced with Jannuzzio's continued access to Greenville's systems, which he refused to return, Greenville explicitly advised Jannuzzio on May 28, 2021 to "[c]ease and desist from using

8

or disclosing Greenville Ventures, LLC's trade secrets and confidential and proprietary information." **Ex. 1**, May 28, 2021 Ltr. But for months Jannuzzio ignored these directives too, boasting: "I have the keys to the crib and I don't have to give them up" and if Danby wanted them he would have to "buy me". **Ex. 75**.

Feigning loyalty to Danby, Nix remained at Greenville after Jannuzzio's resignation, but continued to secretly work closely with Jannuzzio as they set up Tondo. *See, e.g.*, **Ex. 63** (June 9, 2021 text message regarding proposed business logos for Tondo). By June 17, 2021 – though still employed and purportedly working for Greenville – Nix already had his own Tondo email address and was assisting Jannuzzio at Tondo. *See* **Ex. 60** (e-mail to Nix regarding ███████████████

██████████████ On July 1, 2021, Nix finally provided his two-weeks' notice of resignation to Greenville, **Ex. 116,** but engaged in active work for Tondo throughout his notice period, **Ex. 51** ████████████████████████████████████████████████████ ). Malizia resigned from Greenville just over a week later on July 9, 2021, without notice. **Ex. 108**.

### E.      Defendants' Post-Resignation Control Over and Access to Greenville Data

By the time Malizia resigned, given Jannuzzio's extortionate demand for $1,000,000 cash to be paid in three days, and his refusal to return and cease using critical Greenville assets, each Individual Defendant was sent correspondence demanding that they cease and desist accessing and/or using any of Greenville's data and that they immediately return all access and control back to Greenville. *See* **Ex. 2** (demanding Jannuzzio's "immediate, orderly, and complete transition of any and all Greenville accounts/assets"); **Ex. 4** (demanding Nix cease and desist improper actions including refusal to provide log-in credentials); **Ex. 3** (demanding Malizia cease and desist unlawful access to Greenville information); **Ex. 5** (again instructing Nix to "cease and desist from unlawfully utilizing credentials to log into Greenville's stores"); **Ex. 6** (again instructing Malizia

to cease and desist using Greenville's account credentials). The Individual Defendants staunchly refused to follow these directives, and for months after their resignations – and while they were scaling up at Tondo – they maintained control over, and continued to access and use, Greenville's most sensitive information for the benefit of Tondo, while at the same time making efforts to obstruct and sabotage Greenville.

There is no dispute that the Defendants continued to access nearly every Greenville platform for many months after their resignations, including Greenville's: Facebook Business Managers (which includes customer demographics; the entire history and success of all product ad campaigns; customer behavioral data, etc.); Shopify stores and PayPal accounts (which includes all order and sales histories, customer names, product prices, margins, etc.); G-Suite/Google Workspace (which includes access to and control over all Greenville emails and its Google documents/files which included Greenville's trade secret databases compiled in its comprehensive and proprietary databases tracking all Greenville marketing efforts); Time Doctor and Gorgias software platforms (which enabled Defendants to secretly monitor the conduct of Greenville workers and read and track all customer inquiries and Greenville's responses), among others. *See* **Ex. 31**, McCrory Report at 8-10, 12-17 (describing Greenville's web-based platforms and Defendants' post-resignation accesses); **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 76:4-7, 138:18-20, 157:4-8, 187:15-21, 493:1-7 (admitting accesses); **Ex. 24**, J. Jannuzzio 4.12.23 Dep. at 129:12-20.

a)      *Defendants' Withholding of Facebook Assets*

Jannuzzio had Greenville's Facebook assets and accounts set up under various "decentralized" individuals – family and friends – that he and Nix hand-picked because they could be trusted and controlled. Specifically, their parents and Jannuzzio's brother and girlfriend. **Ex. 127** (Jannuzzio instructing Nix to open a new Business Manager under his mother's profile); **Ex.**

10

120 (Jannuzzio's notes regarding picking trusted individuals to hold social media assets). Post-resignation, and wholly ignoring the basic principles of agency, Jannuzzio took the incredible position that these decentralized assets, which he and Nix (as owners of Greenville) asked their family members to set up for the benefit of Greenville, to sell Greenville products to Greenville's customers somehow were not Greenville's. Rather, Jannuzzio argued, these assets were owned by Jannuzzio individually, or by those he asked to house Greenville's assets under their individual Facebook profiles – a prerequisite to opening Facebook business assets. **Ex. 80** at 0000007 (7/20/21 letter asserting Jannuzzio owns the assets in his personal capacity); **Ex. 34**, BOLAND000204 (asserting Jannuzzio owns the assets); ECF No. 19, Defendants' Answer ¶ 170 (asserting for the first time that family members and friends chosen to house the assets "own" them, not Greenville); **Ex. 12**, November 4, 2022 Response to Cease and Desist Letter (re-asserting family/friend ownership). Due to this position, Mr. Jannuzzio refused to transfer administrative access to those accounts back to Greenville, unless he received his desired buyout. **Ex. 80** at 0000007 (stating that Jannuzzio "will transfer administrative control of the Assets as part of a purchase agreement for his membership interest and upon receipt of fair compensation. . . .").

In August of 2021, Greenville faced Facebook ad account and other restrictions. *See* **Ex. 118** (Greenville notified Jannuzzio of Facebook issues). Rather than immediately assisting Greenville in seeking the necessary review, Jannuzzio instead refused to help, insisting that his administrative access was not necessary to seek review, costing Greenville precious time and hindering its efforts to resuscitate its accounts, which have to this day, never been recovered. *See id.*; **Ex. 117**; **Ex. 112**; **Ex. 58** at 76-78; **Ex. 59**; **Ex. 50** (email exchanges seeking Jannuzzio's assistance in filing an appeal, which he refused to provide).

b)      *Obstruction of Greenville's Control of Shopify Stores*

Defendants not only repeatedly accessed the backends of Greenville's Shopify stores post-resignation, *see, e.g.*, **Ex. 81**; **Ex. 83 & Ex. 89** (evidencing such accesses), but Jannuzzio attempted to block Greenville from reclaiming ownership and control of its Shopify stores, causing an administrative lockout from Greenville's stores. **Ex. 96 & Ex. 67**. When Jannuzzio realized that Greenville was contesting his claimed ownership of these stores, he immediately exported full product lists from Greenville's stores so he would have them in case his access was cut off. **Exs. 110-111**. Greenville was finally able to wrest control of these stores from Jannuzzio when Shopify approved transfer of the stores from Jannuzzio to Danby so that Danby could continue Greenville's operations. **Ex. 97**.

c)      *Defendants' Refusal to Return and Continuing Access to Greenville's Google Workspace*

Despite being instructed just two days after his resignation to return his access to Greenville's master email accounts (@greenvilleventures.com) held under Greenville's Google Workspace, **Ex. 85**, Jannuzzio and Nix withheld administrative control over the Google Workspace until *December 2022* when the Special Master ordered them to return control to Greenville. *See* ECF No. 56 ¶ 13. Access logs pulled from the Google Workspace show the Individual Defendants' repeated and ongoing access of the Google Workspace post-resignation, including to Greenville's emails, trade secret databases, and other documents containing confidential and proprietary data, until they were ordered to return it. *See* **Ex. 31,** McCrory Expert Report at 14 (describing Defendants' repeated accesses to the Workspace as shown by access logs).

## III.     ARGUMENT

### A.      Defendants are Not Entitled to Summary Judgment on Greenville's Trade Secrets Claims.

Because there are material disputes of fact about Greenville's ownership of trade secrets, the protection of those trade secrets, and Defendants' misappropriation of the same, Defendants motion for summary judgment on Greenville's DTSA and PUTSA claims must be denied.

#### 1.      The Record Establishes Greenville's Ownership of the Trade Secret Databases.

Defendants incorrectly claim that Greenville cannot establish ownership of a trade secret. Def.'s Memo of Law in Support of Motion for Summary Judgment ("Motion") at 5-6, 11-12.[2]

As an initial matter, whether information qualifies as a trade secret is generally a question to be resolved by the trier of fact, rather than at summary judgment. *REVZIP, LLC v. McDonnell*, No. 3:19-CV-191, 2023 WL 3260662, at *23 (W.D. Pa. May 4, 2023); *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp. 3d 465, 474 (E.D. Pa. 2014) ("[M]any courts have opined that the question of whether certain information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of fact.") (internal quotations and citations omitted). For this reason alone, Defendants' Motion fails.

Notwithstanding the flawed legal premise of Defendants' argument, they also misstate what Greenville claims are its trade secrets – implying that Greenville claims all confidential information to be trade secrets, *see* Motion at 9 – so they can then argue that such information is insufficiently protected. But Greenville does not claim that all confidential information constitutes its trade secrets. Rather, Greenville's trade secrets are the compilation of a series of comprehensive

---

[2] The DTSA and the PUTSA both "define a 'trade secret' as information that: (1) the owner has taken reasonable means to keep secret; (2) derives independent economic value, actual or potential, from being kept secret; (3) is not readily ascertainable by proper means; and (4) others who cannot readily access it would obtain economic value from its disclosure or use." *Jazz Pharms., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 444 (E.D. Pa. 2018).

databases that it created linking all of its market and customer data into one place, stored on its

restricted and password-protected Google-Workspace, that is automatically updated in real-time

and in one place, and used to make daily strategic decisions on which products to support, which

customers to target and how based on which advertisements directed to each cohort of potential

customers were the most successful.[3]   The fact that Defendants' Motion now ignores the very

existence of these trade secrets is obviously just a litigation tactic as the Defendants themselves

helped to build these compilations and recognized their incredible value. *See* **Ex. 21,** T. Nix. 4.4.23

Dep. 115:7-117:19 ("we can make real time decisions to move products around"… "it allows us

to make fast, real[-]time decisions on product positions"… "It's valuable for the company"…"It

really helps is for us to internally to make smart decisions").

It is well-settled that data compilations like Greenville's can be trade secrets. *Mallet & Co.*

*Inc. v. Lacayo*, 16 F.4th 364, 386 (3d Cir. 2021) (recognizing that a confidential compilation and

organization of even *public* information can amount to a trade secret); *Scranton Prod., Inc. v.*

*Bobrick Washroom Equip., Inc.*, 190 F. Supp. 3d 419, 439 (M.D. Pa. 2016) (same); 18 U.S.C. §

1839(3) (DTSA definition of trade secret includes compilations); 12 Pa. C.S. § 5302 (PUTSA:

"trade secret" includes compilations).

In addition to Nix's own description of these trade secret databases, and their real-time

value to Greenville, *see supra,* **Ex. 21**, T. Nix. 4.4.23 Dep. 115:7-117:19, Mr. Danby also provided

evidence of these trade secrets at his deposition, testifying as to the proprietary nature of

Greenville's databases housed within its Google Workspace, which compiles data from numerous

---

[3] The Defendants are well aware that it is this compilation of proprietary databases that Greenville claims are its trade secrets as the Complaint specifically describes them as "[p]roprietary databases specially designed by Greenville which collect, collate and organize data from various sources, including Facebook, Shopify, Instagram and Google, to allow for the manipulation and mining of that data for actionable intelligence to support the efficient operation and management of an online jewelry business that operates across many online platforms." ECF No. 1, Compl. ¶ 137(d).

sources, including Google, Facebook, Shopify, Pinterest, and others. **Ex. 27**, P. Danby 4.14.23 Dep. at 226:10-21, 153:16-24. Additional evidence of the trade secret nature of this database is provided by Greenville's e-commerce expert, Brad McCrory, who opines that the databases were tremendously valuable and that Greenville took appropriate, industry-standard steps to maintain the secrecy of this information. **Ex. 31**, McCrory Expert Report at 11-12. As McCrory explained:

> Greenville collected detailed information regarding consumer behavior from its [Google, Facebook, Instagram and Pinterest] ad campaigns and [Meta] pixels, as well as granular order and customer information from Shopify and PayPal, and then combined all this data into a comprehensive proprietary database that it created that compiled all of this information into linked Google Sheets where it could all be sorted, collated, manipulated and interpreted. This centralized compilation of proprietary data was created to update in real time enabling Greenville to identify trends and insights and instantly modify its strategies to maximize profitability.

*Id.* at 5; *see also id.* at 11 (noting that the databases were a "constantly appreciating asset which Greenville spent years and millions of dollars accumulating," which could be examined and manipulated to allow Greenville "to identify trends and insights and instantly modify its strategies to maximize profitability;" stating that this information was "of tremendous value not only to Greenville, but to any of its competitors").

Defendants try to deflect the Court's attention away from what Greenville *actually claims* are its trade secrets (its compilation of proprietary databases on its restricted Google Workspace), arguing instead that any information that was accessible by Defendants' family and friends whose profiles Defendants used to house certain Facebook assets are owned by those individuals and not Greenville, and therefore that information cannot be considered Greenville trade secrets. *See* Motion at 10. But Greenville does not claim that any of that information constitutes its trade secrets. And even if it did, those assets are all owned by Greenville.

These individuals were specifically chosen by Greenville personnel to house Greenville assets, specifically (as described by Mr. Jannuzzio himself) because they were trusted to protect

the company. **Ex. 127** (Mr. Jannuzzio: "i just prefer to have it in the family . . . it protects us"); *see also* **Ex. 120** (Jannuzzio notes to use trusted individuals to provide full administrative access to open new business managers and assets).

Defendants' entire ownership theory is premised on the fact that these individuals' user profiles were used to house the assets even though these assets were opened at the request and direction of Greenville's owners (the Individual Defendants themselves) within the scope of their employment, were linked to Greenville's websites and stores, were only ever used for Greenville's business purposes, all costs for ads were paid for by Greenville, and none were ever used by the individuals. **Ex. 18**, D. Jannuzzio Dep. at 22:14-24:8, 56:17-58:17, 96:15-97:5 100:4-7, 104:22-24, 110:2-9, 136:10-13; **Ex. 19**, N. Jannuzzio Dep. at 19:3-15, 37:18-20, 40:2-4, 54:14-16, 55:13-23; **Ex. 16**, L. Nix Dep. at 42:23-43:23, 45:13-24, 61:16-19, 63:16-18, 63:21-23; **Ex. 17**, M. Nix Dep. at 68:20-22, 69:10-18, 77:15-22, 78:17-24, 99:6-9, 160:14-24, 161:17-20, 164:17-20; **Ex. 23**, N. Schneider Dep. at 15:6-11, 69:18-69:2, 70:13-20. Indeed, Nancy Jannuzzio, Jannuzzio's mother, and Nicole Schneider, his girlfriend, both candidly admitted at deposition that Greenville owns the Facebook business managers held by them. **Ex. 19**, N. Jannuzzio Dep. at 45:17-22; **Ex. 23**, N. Schneider Dep. at 15:6-11.

Case law addressing this very issue has indicated that social media assets belong to the company using them, as opposed to the individuals that house them. *See Int'l Bhd. of Teamsters Loc. 651 v. Philbeck*, 464 F. Supp. 3d 863, 870–72 (E.D. Ky. 2020) ("In summary, the Court concludes that the Facebook page and UPS Official Resource Group are property of the Union because they were created to communicate with Union members, held out as official Union pages, promoted on business cards and the official website, and other members of the Union had administrative privileges."); *In re CTLI, LLC*, 528 B.R. 359, 369 (Bank. S.D. Tex. 2015) (The

"fact that the [Company's] Facebook Page was created in the name of the business, was linked to the business's web page, and was used for business purposes places it squarely in the category of property of the Debtor's estate and not personal property.").

Even if Defendants were correct that their friends and family (and not Greenville) own the social media assets (which is, of course, disputed), as noted above *these assets are not the trade secrets at issue in this case* – the comprehensive databases stored on Greenville's restricted Google Workspace are. Importantly, Defendants do not argue that anyone other than Greenville was the owner of the trade secret databases at issue. Nor could they since these databases were created by Greenville personnel, for Greenville's use, using data compiled from ad campaigns and other sources paid for by Greenville, and housed on Greenville's restricted and password-protected Google Workspace paid for by Greenville, which the Special Master even ordered that Defendants return to Greenville as those assets belonged to the company. *See* ECF No. 56 ¶ 13 (Ordering return of Greenville's Google Workspace over 19 months after Jannuzzio's resignation); **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 157:4-8 (admitting that he continued to have access to Greenville's entire Google Workspace post-resignation); 368:3-10 (admitting that the return of control over Greenville's Google Workspace required an order from the Special Master); **Ex. 31**, McCrory Expert Report at 10-12 (describing Greenville's databases); **Ex. 27**, P. Danby 4.14.23 Dep. at 153:16-23 (noting that Sean Carroll designed databases for Greenville); 226:19-227:9 (describing Greenville's database).

> 2.   Greenville Took Reasonable Measures to Maintain the Secrecy of Its Trade Secret Databases.

Whether "reasonable measures" were taken to protect its trade secrets is for the jury to determine. Defendants' assertion that Greenville cannot establish it has taken reasonable measures to keep its trade secrets secret, Motion at 5-6, 11-12, ignores a fulsome record of contrary evidence

making plain that this issue, at a minimum, is factually disputed and therefore not ripe for summary judgment. Defendants' argument also conflates confidential information with trade secret information and contends that because *some* non-Greenville personnel had access to *some* confidential (though non-trade secret) information, Greenville must not have taken reasonable measures to protect *any* information. This is not the law of trade secrets.

Absolute secrecy is not required for trade secret protection. *Houser v. Feldman*, 569 F. Supp. 3d 216, 229 (E.D. Pa. 2021). Trade secret protection requires only that reasonable precautions be in place to prevent disclosures to unauthorized parties. *Brentwood Indus., Inc. v. Entex Techs., Inc.*, No. CIV.A. 04-CV-03892, 2005 WL 757189, at *18 (E.D. Pa. Mar. 31, 2005); *see also Houser*, 569 F. Supp. 3d at 229-30. Whether reasonable measures were taken is a question of fact and "the determination of whether a plaintiff's efforts to maintain the secrecy of its alleged trade secrets were reasonable is not a question susceptible of black-or-white analysis." *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 437 (E.D. Pa. 2013).

The factual record shows that Greenville took reasonable measures to protect its trade secret databases through the use of individual login and password protections, as well as limitations on individual users' permissions to access Google Workspace, which is a common practice in the e-commerce industry, according to e-commerce expert Brad McCrory. *See* **Ex. 31,** McCrory Expert Report at 11-12. Defendants dispute the sufficiency of these efforts, contending that Greenville: (1) took no steps to maintain secrecy with respect to Jannuzzio, Nix or Huang; (2) permitted non-employee virtual assistants, family members and friends to access confidential information; and (3) did not have non-disclosure or confidentiality agreements in place. Motion at 9. None of these arguments has merit. Nor would they be determinative on summary judgment because the reasonableness of measures taken by Greenville to protect its trade secrets (its

proprietary compilation databases) is factually disputed. *See Warman v. Loc. Yokels Fudge, LLC*, No. CV 19-1224, 2022 WL 17960722, at *11 (W.D. Pa. Dec. 27, 2022) ("Warman identifies those measures that he took to keep the recipe a secret and Defendants dispute these facts. Thus, genuine issues of material fact exist regarding whether Warman took reasonable measures to guard the secrecy of what he claims to be a trade secret.").

Nevertheless, record facts show that Greenville *did* take adequate steps to maintain secrecy of its compilation databases, even with respect to Jannuzzio, Nix, and Huang. Jannuzzio and Nix were both well aware of the confidentiality of Greenville's information. **Ex. 91** (Jannuzzio threatening to fire someone over violation of an NDA); **Ex. 129** (non-disclosure and confidentiality agreements prepared by Jannuzzio for Greenville personnel defining "confidential information" as "all information or material that has or could have commercial value or other utility in the business. . . .").[4] Moreover, access to the trade secret databases was extremely limited as one needed access to the Google Workspace, which was password-protected and, even then, also needed to be given shared access rights to see specific documents stored there (including the compilation databases), and Huang was never given these access rights until after the Defendants' resignations. **Ex. 31**, McCrory Expert Report at 6, 11-12 ("only certain Greenville personnel with workspace access credentials who also had specific permissions (i.e. "shared access" privileges) to view that database could do so."); **Ex. 27**, P. Danby 4.14.23 Dep. at 153:15-154:5 (testifying that shortly before his resignation Jannuzzio took control over the Greenville databases without Danby's permission); **Ex. 113** (Jannuzzio's demand for control of database); **Ex. 26**, P. Danby 4.13.23 Dep. at 251:14-17 (testifying that L. Huang did not have access to the trade secret databases before Jannuzzio and

---

[4] Jannuzzio himself orchestrated the situation in which he and his friends did not sign non-disclosure agreements, as he was responsible for preparing these agreements and conveniently chose not to have himself or his friends sign them. **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 488:4-8 ("we didn't sign those NDAs, which you're about to pull out. I didn't sign this, because I didn't want held myself liable.").

Nix resigned); **Ex. 32** (L. Huang only granted access to trade secret databases on July 13, 2021 after Jannuzzio and Nix resignations to help run the business). Importantly, Jannuzzio and Nix **<u>admitted</u>** at deposition that access to Greenville's Google Workspace did not mean that one had full and unfettered access to every document therein. **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 159:3-13, 173:10-23; **Ex. 21**, T. Nix 4.4.2023 Dep. at 218:1-19.

Second, potential access Defendants gave to family and friends to *some* of the data inputs from Facebook and Instagram accounts set up at the behest of Greenville and for Greenville's business purposes does not eviscerate the trade secret nature of the separate compilation databases just because some of that same data was available in both places. The compilation trade secret databases include this information as well as other inputs from multiple sources, including Google, Facebook, Instagram, Shopify, PayPal, and Pinterest. As explained above, none of these family members and friends had access to Greenville's trade secret compilation databases. *See Mallet & Co.*, 16 F.4th at 386 (finding that confidential compilations and organizations of even *public* information can amount to a trade secret); *Scranton Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 190 F. Supp. 3d 419, 439 (M.D. Pa. 2016) ("Although it is undisputed that certain component parts of SP's pricing information would not qualify as trade secret, trade-secret protection may nevertheless be warranted for compilations of this information.").

Although Greenville (indeed the Defendants themselves) engaged friends and family members of Greenville employees to house certain of Greenville's social media assets on Facebook and Instagram, each only had access to the limited information held within the specific assets they housed. There is no record evidence that any of these individuals had access to Greenville's trade secret databases. Moreover, the factual record shows that Jannuzzio and Nix specifically chose these individuals because they trusted them to keep Greenville's confidential

information a secret. *See* **Ex. 127** (Jannuzzio: "i just prefer to have it in the family . . . it protects us"); **Ex. 120** (Jannuzzio notes to use these trusted individuals to open new business managers and assets); **Ex. 38** (Jannuzzio to brother: "Please keep my brands in secrecy. Seriously. It's important.").

Nor is there any record evidence that Greenville's virtual assistants had access to Greenville's trade secret databases.[5] Even if these individuals did have access, that would not destroy Greenville's trade secrets claims because Greenville provided information to each worker **in confidence** for the good of the business. *See Christian v. Lannett Co., Inc., No. CV 16-963*, 2018 WL 1532849, at *5 (E.D. Pa. Mar. 29, 2018) ("the secrecy element of a trade secret is not lost "if the holder of the trade secret reveals the trade secret to another in confidence ... under an implied obligation not to use or disclose it").

Third, contrary to Defendants' argument, lack of a nondisclosure or confidentiality agreement is not dispositive of the reasonable measures inquiry for trade secret protection. *See Alpha Pro Tech,* 984 F. Supp. 2d at 437–38 (stating that consideration of the existence of confidentiality agreements is "but one factor of the analysis"); *EXL Labs., LLC v. Egolf*, No. 10–6282, 2010 WL 5000835, at *5 (E.D. Pa. Dec. 7, 2010) (same); *Swift Bros. v. Swift & Sons, Inc.*, 921 F. Supp. 267, 277 (E.D. Pa.1995) ("Such agreements are not necessary in every case, however, if the other precautions taken by the plaintiff are sufficient."); *see also Lux Glob. Label Co., LLC v. Shacklett*, No. CV 18-5061, 2019 WL 3530424, at *3-4 (E.D. Pa. July 31, 2019) (denying motion to dismiss misappropriation of trade secrets claims under DTSA and PUTSA, where Plaintiff did not have Defendants sign confidentiality agreements but took other reasonable measures to protect trade secret information). Moreover, Jannuzzio himself prepared NDAs on behalf of Greenville

---

[5] Greenville hired the virtual assistants from an outsourcing company, Upwork, and subject to a confidentiality requirement. *See* **Ex. 88**.

and had several individuals sign them, but unilaterally decided not to have himself or his friends sign so that they could act with impunity. **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 489:1-5 (admitting that he was the person who had others sign Greenville's NDAs), 488:5-7 ("I didn't sign this, because I didn't want it held myself liable."). Defendants should not be permitted to overcome Greenville's trade secret claims by themselves orchestrating a situation in which NDAs were not signed.[6]

3.    <u>There is Significant Record Evidence that Defendants Misappropriated Greenville's Trade Secret Information.</u>

Defendants' contention that "the record is absolutely devoid of any confidential information being utilized by the Defendants," Motion at 3, is particularly difficult to stomach because of the overwhelming factual record of Defendants continuing to access Greenville's proprietary and confidential information post-resignation for the benefit of their competing business. As described in detail by Greenville's e-commerce expert, Defendants, particularly Jannuzzio, continued to access Greenville's trade secret databases post-resignation, despite several instructions to cease and desist accessing such information. *See* **Ex. 31,** McCrory Expert Report at 12, 14; *see also* **Ex. 85**; **Ex. 35**; **Exs. 1-6**. The record also includes the incontrovertible proof of access logs exported directly from the Google Workspace showing Defendants' post-resignation access specifically to Greenville's trade secret databases. *See* **Ex. 102** (screen shots of sorted data from spreadsheet); **Ex. 101**; **Ex. 100**; *see also* **Ex. 31,** McCrory Expert Report at 14 (describing Defendants' repeated accesses to databases based upon access logs).

Thus, summary judgment should be denied as to Greenville's trade secrets claims.

---

[6] Defendants claim that Greenville is trying to use its claims to "backdoor" restrictive covenants, despite the fact that Greenville's Operating Agreement provides that they are permitted to compete. Motion at 3. Greenville has *never* taken the position that Defendants may not lawfully compete, but only that they cannot steal Greenville's proprietary information to do so.

22

**B.    Defendants are Not Entitled to Summary Judgment on Greenville's Unfair Competition Claim.**

1.    <u>Pennsylvania Law Recognizes a Claim for Unfair Competition.</u>

Defendants' representation to the Court that Pennsylvania courts have not recognized a common law claim for unfair competition is wrong and premised on a mischaracterization of the following opinions: (1) *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 679 (E.D. Pa. 2018); (2) *Checker Cab Philadelphia, Inc. v. Uber Techs., Inc.*, 689 F. App'x 707, 710 (3d Cir. 2017); and (3) *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 352-53 (Pa. 2014). Motion at 15-16. **Not one** of these cases supports Defendants' representation to the Court. *Teva* actually **approved** of a common law unfair competition claim, stating that several lower state courts have recognized such a claim and that "[t]he Third Circuit has predicted that the Pennsylvania Supreme Court would adopt the Restatement." 291 F. Supp. 3d 659, 679 (citations omitted). *Checker Cab* also embraced a claim for unfair competition, stating: "all unfair competition claims recognized by Pennsylvania courts involve some accusation of 'passing off' of one's own product as another, or a false or dishonest statement, or tortious interference with contract, or intellectual property theft." 689 F. App'x at 708. Oddly, the *Tincher* decision *does not even involve an unfair competition claim*, begging the question of whether Defendants read this case before adding it to their brief.

Contrary to Defendants' representation to this Court, Pennsylvania appellate courts **have long** recognized the common law tort of unfair competition. *See Penn St. Univ. v. Univ. Ortho. Ltd.*, 706 A.2d 863, 870 (Pa. Super. Ct. 1998) ("Common law liability for unfair competition (which includes trademark infringement) is governed by local law"; denying summary judgment as to common law unfair competition claim); *see also Cent. Lending Grp., LLC v. Seckel Cap., LLC*, No. 822 EDA 2016, 2017 WL 4861625, at *9 (Pa. Super. Ct. Oct. 26, 2017) ("Initially, we note that a common law unfair competition claim is relatively broad in scope and is not limited to

the misappropriation of trade secrets."); *Hardy v. Trustees of Univ. of Penn.*, No. 381 EDA 2014,

2014 WL 10556361, at *6 (Pa. Super. Ct. Dec. 26, 2014) ("It is well-settled that '[a] claim of

unfair competition encompasses trademark infringement, but also includes a broader range of

unfair practices, which may generally be described as a misappropriation of the skill, expenditures

and labor of another.'") (citation omitted).

Accordingly, summary judgment as to Greenville's unfair competition should be denied.

      2.    <u>The Pennsylvania Uniform Trade Secrets Act ("PUTSA") Does Not</u>
<u>Preempt Greenville's Unfair Competition Claim.</u>

Defendants next argue that the PUTSA preempts Greenville's unfair competition claim.

Motion at 16. Again, Defendants' argument is hollow, as established precedent states the contrary.

Preemption would be an issue only if Greenville's unfair competition claim were

predicated only on misappropriation of trade secrets, but Greenville's claim is not. *Youtie*, 653 F.

Supp. 2d at 620 ("[P]reemption exists to the extent that [claims] are based on the same conduct

that is said to constitute a misappropriation of trade secrets."). Greenville's unfair competition

claim is based upon much more than the misappropriation of trade secrets. It is also based on

locking Greenville out of its own key data and resources, asserting ownership over Greenville's

Shopify account, conversion of Greenville's web domains, the misappropriation of proprietary and

confidential information; copying Greenville products and marketing content to confuse

consumers, and using Greenville's resources to start a competing venture, and more. ECF No. 1,

Complaint ¶ 161(a)-(g). Each of these allegations is supported by record evidence. *See, e.g.*, **Ex.**

**75** ("I have the keys to the crib and I don't have to give them up because I'm still an owner. You

want the keys? Buy me."); **Ex. 80** at 0000007 (stating that Jannuzzio "will transfer administrative

control of the Assets as part of a purchase agreement for his membership interest and upon receipt

of fair compensation. . . ."); **Ex. 96** at 00007394 (Jannuzzio opposing transfer of Shopify stores to

Greenville, claiming ownership); **Ex. 22,** J. Jannuzzio 4.11.23 Dep. at 459:21-460:8 (claiming that he owned the domains and merely permitted Greenville to use them); **Exs. 110-111** (exports of Greenville product lists from Shopify); **Ex. 128,** Jannuzzio Dep. Exhibit 39 at 2 (use of Greenville server data by Tondo); **Ex. 74** (Jannuzzio states intent to take Greenville assets to "scale faster" at Tondo).

Even were Greenville's unfair competition claim limited to the misappropriation of information, summary judgment due to PUTSA preemption would still be improper because Greenville also has claims that Defendants stole business information that is not subject to trade secret protection. *See, e.g.*, *PNC Mortg. v. Superior Mortg. Corp.*, No. 09–5084, 2012 WL 628000, at *25 n.19 (E.D. Pa. Feb. 27, 2012) (denying summary judgment because conversion claim applies to confidential information that is not trade secrets and is not preempted by PUTSA); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 417–18 (E.D. Pa. 2009) (denying summary judgment because plaintiff's unfair competition claim is not preempted by PUTSA since "[i]t may happen at trial that some or all of this information is found not to be trade secret information, but nonetheless confidential and proprietary in nature"); *E. Frank Hopkins Seafood, Co. v. Olizi*, No. 2:17-CV-01558, 2017 WL 2619000, at *7 (E.D. Pa. June 16, 2017) (denying dismissal of unfair competition claim: "[w]hile this claim would be preempted ... to the extent the information at issue is determined to be trade secret information, the claim may otherwise rest on confidential information which does [not] [sic] qualify for such status.").

      3.    <u>Ample Record Evidence of Defendants' Malicious Acts Against Greenville Undermines Defendants' Claim that Their Conduct Was "Permissible."</u>

Defendants assert that Greenville's unfair competition claim must fail because, according to them, all of their conduct was "permissible" if they remained as minority members of Greenville. Motion at 17. This assertion (which lacks any legal support) runs face-first into a wall

of record facts showing that Defendants acted improperly and with malice toward Greenville, none of which they had a legal right to do.

While the Section 6.05 of the Operating Agreement permits members to compete with Greenville, neither it nor any statute or common law grants members the right to steal Greenville information or to sabotage Greenville, as Jannuzzio and Nix did. *See supra* § III.A.3. First of all, whether Jannuzzio and Nix were even "members" of Greenville when they engaged in unfairly competitive acts is a disputed question of law and fact. There is a threshold dispute as to whether Jannuzzio and Nix remained minority members after their resignations since the Operating Agreement provides that a member is involuntarily dissociated "[i]f the Member is an employee of the Company, [and] the Member's employment with the Company is terminated for any reason or no reason," *see* ECF No. 1, Exhibit A, Operating Agreement, § 1.01; *see also* Pa C.S. § 8861 ("A person is dissociated as a member when any of the following occurs: . . . (2) An event stated in the operating agreement causing the person's dissociation occurs."). And when Greenville issued capital calls to Jannuzzio and Nix, they refused to contribute anything, a tacit acknowledgment that they no longer considered themselves members. *See* **Ex. 15** (letter objecting to capital call and refusing to make contributions).[7]

Even if Jannuzzio and Nix were still members of Greenville (they are not), neither Section 3.05 of the Operating Agreement nor Section 8850 of Pennsylvania's LLC Act authorized Defendants' *repeated* access to Greenville's information and systems post-resignation, as Defendants contend. Motion at 19. Rather, these provisions provide for a specific procedure by which members may access Greenville's books and records, and do not provide Defendants *carte*

---

[7] Jannuzzio and Nix cannot have it both ways. They cannot claim to remain minority members post-resignation but at the same time refuse to comply with the obligations minority members have, including making capital contributions in response to a capital call. ECF No. 1, Exhibit A, Operating Agreement § 4.01 (requiring that members contribute to capital calls pro rata).

*blanche* to log into Greenville's online accounts anytime they wanted. *See id.* Even before their resignations, Defendants only had rights to access information as permitted by the Manager, Danby. Section 3.05 of the Operating Agreement provides that members are "entitled to all information to which that Member is entitled to have access pursuant to the [Pennsylvania LLC] Act and subject to the conditions stated therein; provided, however, that . . . the Manager may from time to time determine, due to business concerns, that certain information regarding the business affairs of the Company should be kept confidential[.]" ECF No. 1, Exhibit A thereto, §3.05(a).

The statutory framework provided by 15 Pa. C.S. § 8850 in turn provides that within a manager-managed LLC like Greenville, members are allowed to inspect and copy **during regular business hours at a reasonable location specified by the company** information related to the company's activities, **provided that the information is reasonably connected to their membership interest, a written demand is made with specific details, and the information sought directly relates to the member's purpose.** *See* 15 Pa. C.S. § 8850(b)(2). The statute also provides, consistent with the Operating Agreement, that an LLC may restrict or deny access to or use of certain information "as a matter within the ordinary course of its activities and affairs." § 8850(h). A comment to the statute explains, "Section 8850(h) is a fall-back protection against gaps in the operating agreement. For example, those managing a limited liability company may protect trade secrets from disclosure or prohibit various misuses of confidential information even if the operating agreement has neglected to address this issue." *Id.* at cmt. (emphasis added). Defendants' post-resignation continued remote access of Greenville's systems at their whim without any written request (indeed despite written demands they cease and desist) without giving Greenville any opportunity to deny access to information such as its trade secret databases (which Defendants repeatedly accessed despite explicit letters from Greenville and its lawyers advising that such

access was not permitted), complied with **none** of this procedure, and therefore was not authorized under the Operating Agreement or the law.

Defendants ignore all of this and instead baselessly assert that their conduct was "just and reasonable" to protect themselves in the litigation and was "reasonably related" to their membership interests. Motion at 20, n. 23. Even had Defendants complied with **any** of the required procedures for accessing Greenville's books and records, both of these assertions are hotly disputed by Greenville, and cannot serve as a basis for summary judgment, given significant record evidence of Defendants' malintent. Jannuzzio's texts are particularly illuminating, as he explicitly stated his intention to take a Greenville Business Manager to scale up faster at Tondo, *see* **Ex. 74**, and indicated that he was withholding access to certain of Greenville's assets to leverage a $1 million buyout, *see* **Ex. 75** ("I have the keys to the crib and I don't have to give them up because I'm still an owner. You want the keys? Buy me.").

Defendants also try to excuse their repeated access to Greenville's information as having been done "at the advice of counsel."  Motion at 20. They say their actions were permissible because they were members of Greenville and therefore the information "belong[ed]" to them. They say they wanted to preserve information for litigation and to determine whether Greenville had revoked their access. Motion at 19-20. This is an odd argument given that the bulk of what Defendants looked at post-resignation had nothing to do with checking if they still had access, but was instead used to take competitive information, including their copying of Greenville product information, viewing Greenville's proprietary databases, monitoring conduct of Greenville's personnel, etc. *See, e.g.*, **Exs. 110-111** (post-resignation exports of Greenville product lists); **Ex. 31,** McCrory Expert Report at 14 (describing multiple accesses to Greenville's Google Workspace, including its trade secret databases, and other confidential and proprietary files by Jannuzzio post-

resignation); **Ex. 54** (screen shot of video in which Jannuzzio is monitoring workers' conduct); **Exs. 55-56** (post-resignation access to Gorgias account); **Ex. 109** (Jannuzzio seeking to download all videos showing activities of Greenville workers).

Defendants' argument that, apparently even if their conduct was otherwise unlawful, it should be wholly excused because they had the "advice of counsel" to do what they did is wholly inapplicable. First, this contrived "defense" is not pled anywhere in any of Defendants' filings. Second, by simply alleging that a lawyer approved your conduct does not provide a "get out of jail free" card that excuses you from any liability.[8]  Third, even Defendants' own testimony about this purported "defense" shows why it could not possibly be applicable here.

Defendants fail to provide any factual basis for their "advice of counsel" pardon of their repeated misconduct, which is their burden. *See Am. Int'l Airways, Inc. v. Am. Int'l Group, Inc.*, Civ.A. No. 90–7135, 1991 WL 255661, at \*2 (E.D. Pa. Nov.14, 1991) ("The only way defendant can sustain a defense of reliance on advice of counsel is to present testimony or other evidence of such advice, as well as evidence that all pertinent facts were disclosed to counsel."); *In re Larkin*, No. ADV 12-1809 KCF, 2015 WL 1472115, at \*3 (D.N.J. Mar. 31, 2015) (finding a failure to meet the burden of demonstrating advice of counsel defense).

The advice of counsel defense is "available only to those who, after full and honest disclosure of the material facts surrounding a possible course of action, seek and obtain the advice of counsel on the potential legality of their actions." *Walsh v. E. Penn Mfg. Co.*, 555 F. Supp. 3d 89, 131 (E.D. Pa. 2021), *adhered to on denial of recon.*, No. CV 18-1194, 2021 WL 4215503 (E.D. Pa. Sept. 16, 2021). Here, there are no record facts showing that Defendants made full disclosures of all material facts surrounding their accesses of Greenville's information to counsel. *See* **Ex. 25,**

---

[8]  One could only imagine the impact on our judicial system if defendants could simply say "but my lawyer said it was okay" and this provided a complete defense to any civil claim.

J. Jannuzzio 4.13.2023 Dep. at 18:5-19:2 (indicating that he did not tell counsel that the information he was accessing might be confidential); **Ex. 28**, T. Nix 4.20.23 Dep. at 17:22-24 (testifying he did not even remember his conversations with counsel), 24:10-25:17 (testifying that he did not remember what he told counsel or whether he provided counsel with Greenville's Operating Agreement), 25:20-27:12 (testifying that he did not know if he told counsel that he was part of a venture competing with Greenville). The factual record therefore actually precludes summary judgment on the advice of counsel defense. Nevertheless, even in the absence of evidence that Defendants' lawyers had any sufficient basis to render any alleged advice, the adequacy of such a disclosure question is one for the jury. *Schirnhofer v. Premier Comp Sols., LLC*, 832 F. App'x 121, 125 (3d Cir. 2020) ("the adequacy-of-disclosure question is one for the jury."); *United States v. Traitz*, 871 F.2d 368, 382 (3d Cir. 1989) (affirming submission of advice of counsel defense to jury to determine if the defendants had the requisite intent to violate the law).

Defendants next attempt to excuse their unfairly competitive conduct by contending that Greenville "never revoked" their access to its databases, *see* Motion at 20, despite each having received *multiple* communications from counsel for Greenville revoking any rights to access any Greenville information and directing them to cease and desist. For example:

- On May 26, 2021, just two days after Jannuzzio's resignation, Danby directed that Jannuzzio return access to all systems necessary to run the company. **Ex. 85**.

- On May 28, 2021, Greenville explicitly advised Jannuzzio to "[c]ease and desist from using or disclosing Greenville Ventures, LLC's trade secrets and confidential and proprietary information." **Ex. 1**.

- On July 14, 2021, each Defendant received a cease and desist letter specifically instructing each of them to cease accessing any Greenville accounts. **Ex. 2** (demanding of Jannuzzio "immediate, orderly, and complete transition of any and all Greenville accounts/assets"), **Ex. 4** (demanding Nix cease and desist improper actions including refusal to provide log-in credentials), **Ex. 3** (demanding Malizia cease and desist unlawful access to Greenville

information using credentials). Defendants nevertheless continued to access Greenville's data.[9]

- On August 18, 2021, Greenville again explicitly directed Nix to "cease and desist from unlawfully utilizing credentials to log into Greenville's stores." **Ex. 5**. Nix ignored this letter too, continuing to access Greenville's Beachware Shopify store on September 30, 2021. **Ex. 81**.

- On September 1, 2021, Greenville sent Malizia another letter stating that Greenville was "entirely and comprehensively aware of [his] repeated illegal and improper use of log in credentials to unlawfully access Greenville's sites." **Ex. 6**. But the Google User Log Events Report for Dominic Malizia, **Ex. 100,** shows he continued to access Greenville's Google Workspace into 2022. **Exs. 110-111**.[10]

For all of the foregoing reasons, evidence of Defendants' repeated access to Greenville's confidential and proprietary information post-resignation for use at Tondo, the *very essence* of unfair competition, precludes summary judgment as to Greenville's unfair competition claim.

### C. Defendants are Not Entitled to Summary Judgment on Greenville's Conversion Claim Because There is Significant Evidence that the Individual Defendants Procured Greenville's Information by Improper Means.

Defendants argue that summary judgment on Greenville's conversion claim is proper because their repeated accessing and taking of Greenville's information "was permissible and for legitimate purposes." Motion at 22. As explained above, there is no merit to Defendants' various

---

[9] *See* **Ex. 81** (Malizia accessed Beachware Shopify store on July 20, 2021); **Ex. 83** (Malizia and Nix accessed Greenville's nature-themed Shopify store on July 22, 2021 and August 17, 2021 respectively); **Ex. 89** (Nix accessed Greenville's teaching-themed Shopify store on August 17, 2021); **Exs. 39-43** (access to Greenville's PayPal account on or after August 3, 2021); **Ex. 45** (Jannuzzio August 2021 access to Greenville's Beachware business manager); **Exs. 46-49** (Jannuzzio October 13, 2021 access to multiple Greenville Business Managers); **Ex. 44** (Jannuzzio August 24, 2021 access to Greenville's Brandywine Boutique Business Manager); **Ex. 101** (showing Jannuzzio access to Greenville's Google Workspace throughout August and September 2022).

[10] In a final hail-Mary attempt to justify their conduct, Defendants contend that Danby has used Greenville's information and resources to create and operate businesses competitive with Greenville (GV Partners and LexyMay), which they suggest would excuse *their* improper conduct. Motion at 20. But it is SRILX Partners, not Danby, that own GV Partners, Stip. Facts ¶¶ 30-32, and as a member of Greenville, *see* ECF No. 98-3, Stip. Facts ¶ 2, SRILX Partners was also permitted to compete pursuant to the Operating Agreement, ECF No. 1, Exhibit A, § 6.05. But GV Partners does <u>not</u> compete with Greenville, as its stores sell different themed jewelry lines (relating to STEM, finance and astronomy), *see* **Ex. 84**, unlike Tondo's direct copying of Greenville's beach, medical and nature-themed stores, *see* **Ex. 20**, D. Malizia 4.3.2023 Dep. at 164:17-166:7. Nor does LexyMay compete with Greenville, as it sold products Greenville was unable to sell retail, on a wholesale basis, and only earned about $500 in revenues. **Ex. 69**; **Ex. 84**; **Ex. 62**. At a minimum, whether GV Partners and LexyMay were competitive with Greenville is factually disputed, precluding summary judgment.

attempts to pardon their undisputed, repeated accessing and taking of Greenville's trade secret, confidential and proprietary information post-resignation, despite receiving multiple cease and desist letters. *See Fenton v. Balick*, 821 F. Supp. 2d 755, 761 (E.D. Pa. 2011) (explaining that conversion claim arose when plaintiff demanded return of asset and Defendant refused because that is when defendant's possession become inconsistent with Plaintiff's rights."). Indeed, that the Special Master had to *order* Defendants to return administrative access to Greenville's Google workspace/master email account over 19 months after Jannuzzio resigned, Dkt. No. 56 ¶ 13, belies any claim that Defendants did not procure Greenville's information by improper means. *See Rogers v. Gentex Corp.*, No. 3:16-CV-00137, 2018 WL 1370611, at *9 (M.D. Pa. Mar. 16, 2018) ("Conversion may be committed by [u]nreasonably withholding possession from one who has the right to it.") (citing *Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721 (Pa. 1964)).

Accordingly, summary judgment should be denied as to Greenville's conversion claim.

### D. Defendants are Not Entitled to Summary Judgment on Greenville's Civil Conspiracy Claim.

Wholly ignoring significant record evidence, Defendants argue that "there is no evidence establishing that Defendants ever 'combined or agreed…to do an unlawful act…or to do a lawful act by unlawful means.'"  Motion at 23. Defendants overlook the majority of Greenville's conspiracy allegations and assert that Greenville's civil conspiracy claim is based solely upon Defendants' formation of Tondo to compete with Greenville, which was permitted under the Operating Agreement. *Id.* But Greenville's conspiracy claim is far broader. The evidence shows that Defendants intended to set up a competing enterprise, which was permitted, but through a series of **unlawful means**.

The record contains significant evidence that the Individual Defendants conspired to unlawfully compete with Greenville by stealing and converting its confidential and proprietary

information. The following evidence establishes, *at the very least*, a genuine issue of material fact

as to the Individual Defendants' conspiratorial agreement:

- **Ex. 71** (Jannuzzio and Nix discussing Tondo as their "next chapter" on April 29, 2021, before either had resigned);

- **Ex. 57** (texts between Jannuzzio, Nix and Frank Bromwell (a Tondo Vice President): ███████████████████████████████████████████ ████████ ;

- **Ex. 74** (May 5, 2021 text chain, **just one day after their agreement to name the new company Tondo**, in which Jannuzzio states he is going to take a Greenville Business Manager so that Tondo could "scale quicker");

- **Ex. 60** (Jannuzzio forwards to Nix ████████████████████ [11] ████ ████████████████████████████████████████████████████ ;

- **Ex. 70** (texts where Jannuzzio directs Malizia to file the Tondo's LLC paperwork before either of them resigned from Greenville). [12]

This evidence of agreement, combined with significant evidence that *each* of the individual

defendants engaged in the *unlawful conversion* of Greenville's confidential and proprietary

information after being instructed by Greenville to cease and desist, further shows that Jannuzzio,

Nix, and Malizia conspired to harm Greenville.

There is abundant evidence of overt acts taken by Defendants in furtherance of their

conspiracy to improperly use information taken from Greenville to benefit Tondo. Specifically, on

March 29, 2021, Jannuzzio exported from Shopify a full listing of all of Greenville's MySuperhero

products, which included its medical/doctor-themed products. **Ex. 125**. Jannuzzio then sent a

"Doctor export" spreadsheet to a sourcing agent to copy products for Tondo while still employed

at Greenville. **Ex. 64,** J. Jannuzzio Dep. Exhibit 61. Similarly, just after Greenville requested that

Shopify transfer ownership of its stores from Jannuzzio to Danby, which occurred **months after**

---

[11] Jannuzzio confirmed that this was Nix's Tondo email address. **Ex. 24,** J. Jannuzzio 4.12.23 Dep. at 92:8-93:10.
[12] Tondo was formed on May 17, 2021. **Ex. 90**.

**his resignation**, Jannuzzio used his administrative access to export full product lists for Greenville's Brandywine and Beachware Shopify stores, *see* **Ex. 96** (Danby requesting Shopify transfer on August 5, 2021); **Exs. 110-111** (August 6, 2021 product lists exported by Jannuzzio). Other evidence suggests that Tondo used Greenville's information to target ad campaigns for its own military-themed store (a copycat of Greenville's MySuperhero military line).[13] *See* **Ex. 128**, Jannuzzio Dep. Exhibit 39 at 2 (showing Tondo's use of Greenville's "server data" to target Armed Forces Boutique Ad campaigns, just one day after that store launched).[14]

This evidence of wrongful acts is in addition to significant evidence of Defendants' wrongful intent. *See* **Ex. 75** ("I have the keys to the crib and I don't have to give them up because I'm still an owner. You want the keys? Buy me."); **Ex. 74** (Jannuzzio stating his intent to take Greenville assets to help Tondo scale faster); **Ex. 66** (Jannuzzio to Schneider: "Sometimes I feel really bad about what I'm gonna do"); *id.* at 000161 (Jannuzzio to Schneider: "I'm going to royally fuck him with this move.").

Given that these issues all turn on facts which the parties dispute, Defendants are not entitled to summary judgment on Greenville's civil conspiracy claim.

### E.    Defendants are Not Entitled to Summary Judgment on Greenville's Tortious Interference Claim Given the Significant Evidence of Jannuzzio's Intent to Harm Greenville and Unauthorized Conduct.

Turning a blind eye to significant record facts showing that Jannuzzio withheld access to critical assets and obstructed Greenville's business relationships, knowing full well that his actions would impede normal business operations, Defendants argue that they are entitled to summary judgment on Greenville's tortious interference claim because "the Record conclusively establishes

---

[13] *See, e.g.,* ECF No. 1, Compl. ¶ 126 (containing side by side comparisons of products).
[14] *See* **Ex. 14**, January 17, 2023 (misdated as 2022) correspondence from defense Counsel supplementing Defendants' interrogatory responses at 2, providing a launch date of October 8, 2021 for Armed Forces Boutique.

that Jannuzzio acted without the intent to harm." Motion at 26. It is hard to imagine anything that is more clearly disputed in the record.[15]

Jannuzzio repeatedly interfered with Greenville's business relationships directly contradicting explicit instructions from Greenville's Manager, Danby, who had full authority to "make all decisions and take all actions for the company."[16] Just two days after Jannuzzio's resignation, Danby instructed Jannuzzio not to make any more financial decisions on behalf of the company and that going forward all financial decisions would be made by Danby as Manager and directing Jannuzzio to return access to all systems necessary to run the company. **Ex. 85**. These instructions were reiterated in cease and desist letters dated May 28, 2021 and July 14, 2021. But Jannuzzio refused to comply with any of them. He chose instead to interfere with Greenville's operations and its vendor relationships at every opportunity by:

- Cancelling all of Greenville's credit cards without warning (within hours of Danby's May 26, 2021 communication), **Ex. 86**;

- Refusing to return access to Greenville's master email account and Google Workspace for 19 months until the Special Master ordered its return, ECF No. 56 ¶ 13;

- Opposing transfer of Greenville's Shopify stores to Danby, **Ex. 96**;

- Refusing to relinquish control over Greenville's social media assets, *see* **Ex. 75** ("I have the keys to the crib and I don't have to give them up because I'm still an owner. You want the keys? Buy me."), **Ex. 34** at 12 ("These are not 'company assets' and do not belong to Greenville…[T]hat said, as always, I will consider any request Greenville makes regarding the continued sharing of those assets.");

- Refusing to appeal asset restrictions imposed by Facebook despite being the only person with the administrative access to do so, and only belatedly granting Greenville temporary administrative access to file an appeal, *see* **Ex. 118** (Greenville notifying Jannuzzio through counsel of Facebook issue and Jannuzzio's response indicating that he was unwilling to confirm his identify with Facebook to facilitate an appeal), **Ex. 117** (evidencing that

---

[15] *See, e.g.,* **Ex. 75** ("I have the keys to the crib and I don't have to give them up because I'm still an owner. You want the keys? Buy me."); **Ex. 74** (Jannuzzio stating his intent to take Greenville assets to help Tondo scale faster); **Ex. 66** (Jannuzzio: "Sometimes I feel really bad about what I'm gonna do"); *id.* at 000161 (Jannuzzio: "I'm going to royally fuck him with this move.").

[16] *See* ECF No. 1, Exhibit A, Operating Agreement § 6.01.

Greenville's personnel could not take the required action because only Jannuzzio held the administrative access), **Ex. 58** at 76-78 (Jannuzzio again refusing to give Greenville permanent administrative access to its own information); and

- Refusing to transfer to Greenville its active web domains purchased from GoDaddy, which Greenville paid for and even Jannuzzio agrees Greenville owns, *see* **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 461:11-15 (admitting that domain names paid for with Greenville's credit card "are Greenville's"), **Exs. 77-79** (receipts for domains paid for with Greenville's credit cards); **Ex. 68** at 113, 116 (Greenville's Chase Bank statements showing GoDaddy charges to purchase and renew domains).

There is no excuse for Jannuzzio's misconduct and malice toward Greenville. Jannuzzio's attempt to hide behind an "advice of counsel" defense fails because he cannot establish the prerequisites for that defense. *See supra*, § III.B.3. Also, because the question of whether conduct is privileged is "ordinarily a fact intensive inquiry that necessitates jury consideration," entry of summary judgment on this basis would be improper. *Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*, 321 F. Supp. 3d 503, 522 (M.D. Pa. 2018), *aff'd*, 816 F. App'x 644 (3d Cir. 2020).

Because there are genuine disputes of material fact regarding the impropriety of Jannuzzio's malicious misconduct and whether such conduct was privileged or justified, summary judgment on Greenville's tortious interference claim must be denied.

### F.    Defendants are Not Entitled to Summary Judgment on Greenville's Breach of Fiduciary Duty Claim.

#### 1.    There is a Genuine Issue of Material Fact as to Whether Malizia Owed Greenville a Duty of Loyalty.

Defendants assert (without explanation or citation to *any* authority) that Malizia never owed Greenville a duty of loyalty because he was an independent contractor. Motion at 27. First, whether Malizia was an employee or an independent contractor is **not** an undisputed fact, as Malizia himself testified that he believed he was an employee of Greenville. **Ex. 20**, Malizia 4.3.23 Dep. at 76:12-19, 117:17-19.

Second, even assuming Defendants were correct that Malizia was an independent

contractor, case law makes clear that agents are bound by fiduciary duties. *Castle Cheese, Inc. v. MS Produce, Inc.*, No. CIV.A 04-878, 2008 WL 4372856, at *9 (W.D. Pa. Sept. 19, 2008) ("All agents are bound by the fiduciary duties of loyalty and obedience to the principal"). Whether an independent contractor is an agent of a company is a fact-intensive inquiry because "independent contractors 'may be agents ... subject to the fiduciary duties of loyalty and obedience ... or they may be persons employed ... without fiduciary obligations,' suggesting that independent contractors may or may not be subject to fiduciary duties." *N. Am. Commc'ns, Inc. v. Sessa*, No. CIV.A. 3:14-227, 2015 WL 5714514, at *10 (W.D. Pa. Sept. 29, 2015) (quoting *Commw. v. Minds Coal Mining Corp.*, 60 A.2d 14, 17-18 (Pa. 1948)) (omissions in original).

Here, there is a genuine issue of material fact as to whether Malizia was an agent of Greenville subject to a fiduciary duty:

- Malizia worked full-time for Greenville. **Ex. 20,** Malizia 4.3.23 Dep. at 65:23-24;

- Greenville tasked Malizia with photographing Greenville's advertisements and performing customer support, which were a regular part of Greenville's e-commerce business. **Ex. 20,** Malizia 4.3.23 Dep. at 64:24-65:8 (indicating that he just helped out at Greenville wherever he could);

- Greenville paid Malizia a salary for his work. **Ex. 20,** Malizia 4.3.23 Dep. at 50:20-51:12 (indicating starting as an hourly employee at Ironlinx, but ending at Greenville on salary);

- Malizia testified that he believed he was a Greenville employee. **Ex. 20,** Malizia 4.3.23 Dep. at 76:12-19, 117:17-19.

        2.    There is a Genuine Issue of Material Fact as to Whether Jannuzzio and Nix Owed Greenville a Duty of Loyalty.

Defendants next contend that because Jannuzzio and Nix were permitted to compete as members under the terms of the Operating Agreement, they did not owe a fiduciary duty to Greenville as employees. Motion at 26-27. This is not the law and conflates Jannuzzio and Nix's duties *as members* of Greenville with their duties of loyalty owed to Greenville *as employees. See Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014) ("Pennsylvania law

dictates that an employee, as the agent of his employer, owes his employer a duty of loyalty").

Nevertheless, a breach of fiduciary duty claim is only barred based upon the existence of a contract

if there are "no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist

outside" of the parties' contractual agreements. *Brown & Brown v. Cola*, 745 F. Supp. 2d 588, 621

(E.D. Pa. 2010); *Wen v. Willis*, No. CV 15-1328, 2015 WL 6379536, at *4 (E.D. Pa. Oct. 22, 2015)

(same). Here, even though the Operating Agreement permitted Jannuzzio and Nix to lawfully

compete as members of Greenville, it did not and does not excuse their violation of fiduciary duties

as employees of Greenville. And it certainly did not authorize them to unlawfully misappropriate

Greenville's trade secret and proprietary information while still Greenville employees in order to

set up a directly competitive venture, which is exactly what occurred here.

3.   <u>The Individual Defendants' Competitive Conduct While Still at Greenville<br>Went Beyond Preparatory Measures.</u>

Defendants next assert that summary judgment is appropriate because their competitive

conduct while working at Greenville was merely "preparatory." Motion at 27. While Pennsylvania

law permits an agent or employee to "make arrangements to compete," it prohibits one from acting

to harm his employer, such as stealing "confidential information peculiar to his employer's

business and acquired therein." *Pro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 414 (E.D.

Pa. 2009). Thus, an employee who, "while still working for her employer, makes improper use of

her employer's trade secrets or confidential information, usurps a business opportunity from the

employer, or, in preparing to work for a rival business, solicits customers for such rival business,

may be liable for a breach of the duty of loyalty." *Id.*; *see also Synthes,* 25 F. Supp. 3d at 672-74

(granting summary judgment on breach of fiduciary duty claim based upon findings, *inter alia*,

that former employee, while still employed by the plaintiff solicited plaintiff's customers and

copied documents while actively planning a competitive business, indicating that the "sole

38

reasonable inference is that the documents were part of competitive activity.").

Here, there is significant evidence of record that Defendants' actions went far beyond mere preparation to compete. Their malicious acts while still in Greenville's employment included improper use of Greenville's trade secret and confidential information, as well as solicitation of Greenville's agents. Specifically:

- On March 25, 2021, Mr. Jannuzzio purchased domains for one of Tondo's future stores – Frontline Boutique. **Ex. 76**;

- On March 29, 2021, Mr. Jannuzzio exported a full listing of all of MySuperhero's products. **Ex. 125**;

- Less than a month later, Jannuzzio directed a member of the Greenville team to make him the "owner" of Greenville's trade secret databases, entitled "Greenville Documents," giving him unfettered access to this valuable data, which was stored in Greenville's Google Workspace (which he continued to access while at Tondo) as he was simultaneously working to set up Tondo. **Ex. 113**;

- In late April 2021, Mr. Jannuzzio and Mr. Nix were choosing the name for Tondo. **Ex. 73**;

- On May 3, 2021 Mr. Jannuzzio indicated in a text that he intended to take Greenville assets to "scale faster" at Tondo. **Ex. 74**;

- On May 6, 2021, Mr. Jannuzzio directed Mr. Nix to export "all store data" for two of Greenville's stores. **Ex. 119**;

- Just a day later, Mr. Jannuzzio sent a "doctor" spreadsheet to a sourcing agent to source the products he had previously exported for Tondo. **Ex. 64,** J. Jannuzzio Dep. Exhibit 61;

- In the weeks leading up to his resignation, Jannuzzio also made efforts to solicit several of Greenville's virtual assistants. *See*, *e.g.*, **Ex. 121**; **Ex. 124**;

- On May 17, 2021, Jannuzzio formed Tondo to directly compete with Greenville in the exact same costume jewelry niches – beach, nature, medical and military, **Ex. 90**;

- On May 23, 2021, the day before he formally resigned from Greenville, Jannuzzio took a lengthy video of all of Greenville's inventory listed in its InfoPlus warehouse management account, **Ex. 53**.

The foregoing record evidence creates a genuine issue of material fact as to whether Defendants have breached a fiduciary duty to Greenville, precluding entry of summary judgment.

### G.     Defendants are Not Entitled to Summary Judgment on Greenville's Unjust Enrichment Claim.

Defendants assert they are entitled to summary judgment on Greenville's unjust enrichment claim because, as they see it, this claim arises out of the Operating Agreement and is premised solely upon the misappropriation of trade secrets. Motion at 29. Although Defendants cite case law indicating that unjust enrichment claims premised upon the terms of a written agreement are not viable, *see* Motion at 29, this rule of law is inapplicable where, as here, the unjust enrichment claim ***does not*** arise from conduct governed by contract. *See Alpha Pro Tech*, 984 F. Supp. 2d at 447–48 (finding that an unjust enrichment claim premised on misappropriation of trade secrets or other confidential information was not prohibited by "bar on double recovery for breach of contract and unjust enrichment" because the claim of misappropriation did not arise from conduct governed by the contract between the parties).[17]  The mere fact that Greenville has an Operating Agreement does not preclude it from maintaining an unjust enrichment claim. Nor does Greenville's unjust enrichment claim rise or fall with its trade secrets claim, as Greenville's unjust enrichment claim is premised upon the misappropriation of trade secrets *as well as* a mountain of other confidential and proprietary business information that Defendants videoed, copied and/or accessed for their use at Tondo. *See Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009) (denying summary judgment as to unjust enrichment claim when "[g]enuine issues of material fact exist as to whether Thermax accepted and retained Purolite proprietary confidential information other than information that would qualify for trade secret status").

As in *Alpha Pro Tech* and *Bro-Tech*, Greenville's unjust enrichment claim survives

---

[17] The *Alpha Pro Tech* decision also rejected the argument that an unjust enrichment claim premised on potential trade secrets was preempted by PUTSA, unless and until the information was shown to qualify as a trade secret because an unjust enrichment claim may be premised upon the misappropriation of confidential information that does not qualify as a trade secret. 984 F. Supp. 2d at 447-48.

because it is predicated on Defendants unjustly enriching themselves through misappropriation of Greenville's trade secrets *and* theft of non-trade secret business information. *See* ECF No. 1, ¶ 224 ("Individual Defendants have benefitted from Greenville by **misappropriating Greenville's Trade Secret Information or other confidential, proprietary information that may be determined not to be Greenville's Trade Secret Information**, as well as its intellectual property.") (emphasis added). Even the Defendants, themselves, tacitly admit in their motion that Greenville's case is premised upon **more** than the Operating Agreement, thus invalidating their own argument. Motion at 30 ("dispute concerns, ***inter alia***, Defendants' supposed violations of the Operating Agreement.") (emphasis added). The mere existence of an Operating Agreement has nothing to do with whether Defendants were unjustly enriched by misappropriating Greenville's trade secret, confidential and proprietary information and theft of business information and assets generally.

Further, there is, at a minimum, a factual dispute as to whether Defendants misappropriated anything, *see supra* §§ III.B.3, III.C. & III.D. There is also a factual dispute as to whether the disputed misappropriation unjustly enriched the Defendants. For example, record evidence shows that Defendants' misappropriation of Greenville's trade secret compilation databases and other confidential and proprietary information – which took Greenville years to collect and cost millions of dollars to accrue – provided Defendants a "head start" at Tondo saving it millions of dollars. *See* **Ex. 30**, D. Landau Expert Report at ¶¶ 41-43; *PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd.*, 47 F.4th 156, 161–62 (3d Cir. 2022) ("Under Pennsylvania law, unjust enrichment requires that the defendant pay to plaintiff the value of the benefit conferred. And, as authorities elsewhere establish, that benefit need not be a profit that was realized; it can be a cost that was avoided.") (internal quotation omitted).

Therefore, Defendants are not entitled to summary judgment on Greenville's unjust enrichment claim.

**H.      Defendants are Not Entitled to Summary Judgment on Greenville's SCA and CFAA Claims.**

The SCA and CFAA statutes prohibit unauthorized access to stored electronic communications and information, respectively. *See* 18 U.S.C. § 2701(a) (SCA); 18 U.S.C. § 1030 (CFAA). Defendants seek summary judgment arguing only that: (1) their access to Greenville's information was not unauthorized, Motion at 33-37; (2) there is no violation of the SCA to the extent that the communications at issue were housed on a personal computing device, Motion at 33; and (3) Greenville has not provided evidence of its damages under the CFAA, Motion at 38. None of these arguments has any merit.

1.      <u>Record Evidence of Unauthorized Access to Greenville Electronic Data Precludes Entry of Summary Judgment.</u>

Defendants argue that summary judgment should be entered in their favor on Greenville's SCA and CFAA claims because, according to them, Greenville cannot establish that they accessed anything "without authorization" since, according to Defendants, Greenville never sought to limit or revoke their authorizations. Motion at 33-37. This is **not** supported by the facts of record.

As a preliminary matter, Defendants lacked authorization to access all of Greenville's information technology assets. Defendants even admitted in their depositions that they lacked authorization to access <u>all</u> of Greenville's data and assets. *See, e.g.*, **Ex. 22,** J. Jannuzzio 4.11.23 Dep. at 159:3-13, 173:10-23, 543:20-544:9; **Ex. 21,** T. Nix 4.4.23 Dep. at 218:1-19. Danby, as Greenville's Manager, had the authority to limit the information that Jannuzzio and Nix had access to as members. *See* 15 Pa. C.S. § 8850(h) (an LLC may restrict or deny access to or use of certain information "as a matter within the ordinary course of its activities and affairs."); Operating Agreement § 3.05(a) (notwithstanding members' informational rights, "the Manager may from

time to time determine, due to business concerns, that certain information regarding the business affairs of the Company should be kept confidential[.]").

Even if Defendants *had* unfettered access to all Greenville information pre-resignation (they did not), **such access was clearly and unequivocally revoked** by Greenville after Defendants' resignations. Danby demanded the return of all access and issued multiple cease and desist letters instructing Defendants to stop accessing Greenville's systems. *See supra* § III.B.3. Not a single one of the cases cited by Defendants rejected a SCA or CFAA claim in a situation in which former employees continued to access company systems after being directed not to do so, as is the case here. Indeed, in *Bro-Tech Corp.*, which the Defendants purport to cite in support of *their* argument, the Court **denied summary judgment** on a CFAA claim when a former employee continued to access the plaintiff's computer files after leaving the company. 651 F. Supp. at 407. Disputed facts about whether Defendants were permitted to access Greenville's electronic systems precludes summary judgment on Greenville's SCA and CFAA claims. *See United States v. Eddings*, No. 5:19-CR-00535, 2022 WL 12435082, at *10-*13 (E.D. Pa. Oct. 20, 2022) (approving a jury instruction in CFAA case stating "[w]hether authorized access has been revoked or, whether the cessation of employment rescinds authorization, is a factual question" for the jury.).

## 2. The Material in Question Was Not Housed on a Personal Computing Device

Defendants next argue "to the extent that any of the material in question was housed by [Greenville] on a personal computing device, Defendants' conduct falls outside the scope" of the SCA. Motion at 33 (citing *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 277 (3d Cir. 2016)). Defendants, however, do not identify what information they contend was so housed. Nevertheless, case law interpreting the SCA makes clear that Defendants are not entitled to summary judgment based on this argument.

The Third Circuit has recognized that data housed by centralized communication providers, including "telephone companies, internet or e-mail service providers, and bulletin board services" fall within the scope of the SCA. *In re Google Inc.*, 806 F.3d 125, 146-147 (3d Cir. 2015)(quoting *Garcia v. City of Laredo*, 702 F.3d 788, 792 (5th Cir. 2012)); *see also In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 276 ("[T]he [Federal SCA] aims to prevent potential intrusions on individual privacy arising from illicit access to stored communications in remote computing operations and large data banks that stored emails."). Here, Greenville alleges that Defendants remotely accessed Greenville's online systems and accounts housing communications including through the following electronic platforms: Time Doctor, Facebook, Instagram, Shopify and G-Suite (n/k/a Google Workspace). *See* ECF No. 1, Compl. ¶¶ 233, 244. All of these systems fall within the scope of the SCA. In particular, Greenville's Google Workspace, which Defendants maintained administrative control over and continually accessed post-resignation and after receiving multiple cease and desist letters, housed all of Greenville's email communications (Gmail) and therefore falls within the scope of the SCA. *See Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 337 (E.D. Pa. 2013) (denying summary judgment as to SCA claim based upon improper access to a Hotmail email account). Additionally, Greenville's Time Doctor, Facebook and Instagram accounts acted like online bulletin boards where Greenville could post information and communications for others to read. *See Graham Eng'g Corp. v. Adair*, No. 1:16-CV-2521, 2021 WL 9204331, at *22 (M.D. Pa. Feb. 10, 2021) (Microsoft SharePoint fell within scope of the SCA because it "act[s] akin to an 'email service providers" and an online "bulletin board" where one could post information for another to read). Thus, none of the information at issue was housed on a personal computing device, precluding summary judgment on this issue.

3.     Greenville Has Put Forth Evidence of Its CFAA Damages.

Defendants argue that Greenville has not put forth evidence of its CFAA damages. Motion

at 38. But Defendants are simply ignoring evidence they do not like. Greenville's damages expert

provided evidence of precisely these damages in his report, explaining Greenville's assertion that

it was forced to shut down its stores due to Defendant's improper access and sabotage of its

systems, causing it to have to rebuild its brands anew to prevent Defendants' improper accesses,

at a conservative cost of $162,925, which amount was validated as reasonable by Greenville's e-

commerce expert. *See* **Ex. 30,** Landau Expert Report at 17; **Ex. 31,** McCrory Expert Report at 20.

The Landau Report explicitly referenced the CFAA, explaining that these costs would constitute

Greenville's damages thereunder, as these were the costs incurred in responding to Defendants'

improper accesses of Greenville's systems. **Ex. 30,** Landau Expert Report at 17, n. 27. Therefore,

Defendants' argument that Greenville put forth "no evidence" regarding CFAA damages when

this is explicitly addressed in Greenville's damages report is, putting it generously, baseless.

**I.     Summary Judgment is Not Warranted on Greenville's Judicial Dissociation Claim Given Significant Evidence of Improper Conduct by Defendants.**

Defendants assert that there is no genuine issue of fact regarding the propriety of their

conduct toward Greenville and, therefore, they are entitled to summary judgment on Greenville's

judicial dissociation claim. Motion at 39-40 (asserting that they "have acted properly with respect

to [Greenville] at all times," "have not violated any provision of the Operating Agreement," and

have not engaged in any conduct which makes it "not reasonably practicable [for Plaintiff] to carry

on [its] activities with [Jannuzzio or Nix] as a member."). As shown throughout this brief, every

one of these assertions is, at a minimum, factually disputed.

Even if they were not already dissociated pursuant to the Operating Agreement at the

moment they resigned, [18] Greenville alleged two proper grounds for judicial dissociation: (1) that Defendants have engaged in, and are continuing to engage in, wrongful conduct that has affected adversely and materially affected the affairs and operations of Greenville, ECF No. 1, Compl. ¶269; and (2) that Defendants have engaged in, or are engaging in, conduct relating to the company's activities and affairs which makes it not reasonably practicable to carry on the activities and affairs with the person as a member, ECF No. 1, Compl. ¶ 271.

Importantly, this Court has already held when dismissing Defendants' derivative claims on behalf of Greenville that Defendants are too "antagonistic" to Greenville because they "are involved with their own competing e-commerce jewelry retailers" and that their personal interests are in "conflict" with and "adverse" to Greenville. *See Jannuzzio, et al., v. Danby, et al.*, 22-cv-1189 (E.D. Pa), ECF No. 31 at 32, 34 & 37-39. If the Court has already found that Defendants are too antagonistic to even maintain derivative claims, it would certainly not be "reasonably practicable" for them to carry on as members. *See* Pa. C.S. § 8861(6)(iii).

Additionally, the factual record "*runneth over*" with evidence indicating Defendants' wrongful conduct such that they should not remain as members, including:

- Withholding and obstructing access to key operational assets, preventing Greenville from operating in the normal course. *See, e.g.*,

  - **Ex. 75** ("I have the keys to the crib and I don't have to give them up because I'm still an owner. You want the keys? Buy me.");

  - **Ex. 34** at 12 ("These are not "company assets" and do not belong to Greenville.");

  - Cancelling all of Greenville's credit cards without warning, **Ex. 86**;

  - Refusing to return access to Greenville's master email account and Google Workspace for 19 months until the Special Master ordered its return, ECF No. 56 ¶ 13;

---

[18] The Operating Agreement provides that a Member is involuntarily dissociated "[i]f the Member is an employee of the Company, [and] the Member's employment with the Company is terminated for any reason or no reason." *See* ECF No. 1, Exhibit A, Operating Agreement, § 1.01.

- o **Ex. 96** at 000094 (Jannuzzio opposing transfer of Shopify stores to Greenville, claiming ownership, and causing a back-end lockout);

- o Refusing to appeal asset restrictions imposed by Facebook despite being the only person with the administrative access to do so, and only belatedly granting Greenville temporary administrative access to file an appeal, *see* **Ex. 118**, **Ex. 117**, **Ex. 112**, **Ex. 58** at 2476-78; and

- o Refusing to transfer to Greenville its active web domains purchased from GoDaddy, which Greenville paid for, *see* **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 459:21-460:8 (claiming that he purchased the domains and merely permitted Greenville to use them); **Ex. 22**, J. Jannuzzio 4.11.23 Dep. at 461:11-15 (admitting that domain names paid for with Greenville's credit card "are Greenville's"), **Exs. 77-79** (receipts for domains paid for with Greenville's credit cards); **Ex. 68** at 112-116 (Greenville's Chase Bank statements showing GoDaddy charges to purchase and renew domains).

- The record with respect to Defendants' theft of Greenville's confidential and proprietary information for use by Tondo to unfairly compete with Greenville is also strong. *See, e.g.*,

  - o **Ex. 74** (Jannuzzio stating his intent to take Greenville assets to "scale faster" at Tondo);

  - o **Ex. 113** (Jannuzzio taking control of Greenville's trade secret databases just before resignation);

  - o **Ex. 53** (Jannuzzio video of all Greenville inventory the day before his resignation);

  - o **Ex. 128,** Jannuzzio Dep. Exhibit 39 at 2 (indicating the use of Greenville "server data" to target Armed Forces Boutique Ad campaigns, just one day after that store launched);

  - o **Exs. 110-111,** Greenville00015588-89 (Jannuzzio using administrative access to export full Greenville product lists from Shopify just a day after learning Greenville sought a transfer of control);

  - o **Ex. 64,** J. Jannuzzio Dep. Exhibit 61 (Jannuzzio sending a "Doctor export" spreadsheet to Tondo sourcing agent while still employed at Greenville, close in time to having exported all of Greenville's medical themed products from Shopify, *see* **Ex. 125,** Greenville00047759);

  - o **Ex. 81**, **Ex. 83**, & **Ex. 89** (repeated post-resignation accesses to Greenville's Shopify stores by Nix and Malizia);

  - o **Ex. 101**, **Ex. 100**, **Ex. 114** (post-resignation accesses to Google Workspace and trade secret databases);

  - o **Exs. 40**, **Ex. 39**, **Ex. 41**, **Ex. 42**, **Ex. 43** (Jannuzzio post-resignation access to PayPal accounts);

  - o **Exs. 44-49** (post-resignation access to Facebook assets).

47

Defendants Jannuzzio and Nix also have engaged in serious and repeated violations of the Operating Agreement. As Defendants admit, Greenville's Operating Agreement provides broad authority to Danby as Manager. *See* ECF No. 98-3, Defendants' Facts in Support of Summary Judgment, ¶ 28; ECF1, Exhibit A, Operating Agreement § 6.01 ("the powers of the Company shall be exercised by or under the authority of, and the business direction of, the Manager; and . . . the Manager may make all decisions and take all actions for the Company not otherwise provided for in this Agreement."). Post-resignation, however, Jannuzzio and Nix refused to do as Danby directed with respect to Greenville, cancelling Greenville's credit cards within hours of Danby's direction that all financial decisions for Greenville would be made by him as Manager going forward, *see* **Ex. 85** & **Ex. 86,** ignoring requests that they transfer Greenville's assets back to it, and repeatedly accessing Greenville's trade secret, confidential and proprietary information despite multiple cease and desist letters, *see supra* § III.B.3.

Given the multitude of record evidence regarding the Individual Defendants' improper conduct that would warrant their being dissociated as members (assuming they were not already dissociated upon their resignation) Defendants cannot possibly be entitled to summary judgment on Greenville's judicial dissociation claim.

## IV.    Conclusion

For all of the foregoing reasons, Greenville respectfully requests that this Court deny Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs' Motion for Summary Judgment.

Dated: July 17, 2023                              Respectfully submitted,

**BLANK ROME LLP**

*/s/ Bridget M. Briggs*

48

Jason A. Snyderman, PA ID No. 80239
William R. Cruse, PA ID No. 299576
Bridget M. Briggs, PA ID No. 306607
Danielle C. Hudson, PA ID No. 328931
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
215.569.5500
Jason.Snyderman@blankrome.com
William.Cruse@blankrome.com
Bridget.Briggs@blankrome.com
Danielle.Hudson@blankrome.com

*Counsel for Greenville Ventures, LLC and GV Holdco, LLC*

**MACELREE HARVEY LTD.**

*/s/ Robert A. Burke*
Robert A. Burke, Esquire
J. Charles Gerbron, Esquire
17 W. Miner Street
P.O. Box 660
West Chester, PA 19382
P | 610-436-0100
F | 610-436-7885
rburke@macelree.com
cgerbron@macelree.com

*Counsel to Third-Party Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the foregoing document to be served on all counsel of record via the Court's electronic filing system.

*/s/ Bridget M. Briggs*
BRIDGET M. BRIGGS